64 Cal.App.4th 1159 (1998)
RAINBOW DISPOSAL COMPANY, INC., Plaintiff and Appellant,
v.
ESCONDIDO MOBILEHOME RENT REVIEW BOARD, Defendant and Respondent; CITY OF ESCONDIDO, Real Party in Interest.
Docket No. D027338.
Court of Appeals of California, Fourth District, Division One.
May 26, 1998.
*1161 COUNSEL
Terry R. Dowdall for Plaintiff and Appellant.
Endeman, Lincoln, Turek & Heater, Donald R. Lincoln and Linda B. Reich for Defendant and Respondent.
Jeffrey Epp for Real Party in Interest.
OPINION
O'NEILL, J.[*]
Rainbow Disposal Company, Inc. (Rainbow), owner of a mobilehome park in the City of Escondido, appeals a judgment denying its petition for writ of mandate (Code Civ. Proc., § 1094.5) challenging the adequacy of a rental increase authorized by the Escondido Mobilehome Rent Review Board (the Board). Rainbow contends (1) the Board improperly excluded from consideration as capital improvement expenses the money Rainbow spent in improvements to the park's gas and electric utilities and *1162 (2) the rental increase the Board authorized gives Rainbow an insufficient return on the park's depreciated net assets. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
In 1990 Rainbow purchased a 165-space mobilehome park known as Lake Bernardo Mobile Estates (the park) for $4,950,000 plus closing costs. The park is subject to an Escondido rent control ordinance which, as this court has noted, "has generated significant appellate activity." (Westwinds Mobile Home Park v. Mobilehome Park Rental Review Bd. (1994) 30 Cal. App.4th 84, 88 [35 Cal. Rptr.2d 315], fn. omitted.)
In June 1994 Rainbow filed its second application for a rent increase. The Board granted an increase of $6 in January 1995.[1] In March Rainbow commenced the instant action by filing a petition for administrative mandamus challenging the Board's decision. Rainbow filed a first amended petition in May in response to the Board's demurrer and motion to strike the original petition.[2]
Before a hearing was held on Rainbow's first amended petition, the parties stipulated that the Board would rescind its decision granting a $6 rent increase and rehear the matter. In November 1995 Rainbow filed a new application seeking a rent increase of $58.33.
The Board issued a comprehensive staff report on Rainbow's new application. Attached to and discussed in the staff report were the reports of two consultants, Dr. Kenneth Baar and Dr. James Gibson, each of whom the Board hired to perform a "fair return" analysis  i.e., an analysis of how much rent increase would be required to give Rainbow a fair return on its investment in the park.
Baar's analysis was based on a "maintenance of net operating income" (MNOI) approach into which he factored the increase in the consumer price index (CPI) between June 1991 and June 1995, the increase in Rainbow's operating expenses during that same period, and a return on Rainbow's *1163 expenditures on capital improvements to the park. Based on these factors Baar recommended a range of rent increase from $37.21 to $57.33.
In calculating Rainbow's capital improvement costs, Baar excluded expenditures of over $200,000 for gas and electric improvements, which comprised 48 percent of Rainbow's total expenditures for capital improvements during the relevant time period. Baar excluded the gas and electric improvements on the theory Rainbow was already being compensated for them through the rates it charged tenants for gas and electricity. Amortizing the remaining capital improvement costs over 27 and 1/2 years at 10 percent interest, Baar proposed a rent increase of $11.80 for capital improvements, in addition to other increases.
Gibson used an "historical cost/book value" approach in his fair return analysis. Gibson's approach involved calculating a rate of return for the park by dividing various estimates of the park's net income by various estimates of the value of its assets, and then comparing the resulting rates of return with certain published "benchmark" rates of return for profitable businesses. Gibson determined the amount of overall annual rent increase required to provide Rainbow with a fair return by multiplying the difference between a particular benchmark rate and the park's rate by the park's asset value. The results of Gibson's approach varied greatly depending on the data used. However, Gibson initially recommended an increase between $45.17 and $58.33. At a hearing on Rainbow's application, Gibson stated that if the gas and electric improvements were subtracted from his estimate of the park's historical cost/book value, his recommended range of rent increase would be from $35.17 to $48.33.
Also attached to the staff report were a fair return analysis by the park residents' representative, John Herzing, and an appraisal report by James Brabant, concluding the value of the park at the time Rainbow purchased it was $3,685,000. Based on his own MNOI analysis, Herzing requested a rent increase of $10.08, minus $6.14 for loss of amenities and other offsetting factors.
The staff report mathematically "harmonized" the data, including Baar's and Gibson's recommendations, the CPI, and the amount by which the park's rent was below comparable parks in the area, to arrive at a recommended increase of $36.09.[3]
On January 14, 1996, the Board held a hearing on Rainbow's revised application. Baar and Gibson explained their fair return analyses; Herzing *1164 argued there should be no rent increase; Brabant reiterated his opinion that the park was worth $3,685,000 at the time Rainbow purchased it; and Rainbow introduced a real estate broker who supported Rainbow's $4,950,000 purchase price. One resident advocate argued the hearing was illegal because the Board lacked jurisdiction to reconsider its original $6 rent increase and another discussed loss of amenities in the park.
On February 14 the Board issued a supplemental staff report to which supplemental reports by Baar and Herzing were attached. Baar explained differences between his analysis and Herzing's and reiterated his recommendation that rent be increased by $37.21. Herzing criticized Baar's analysis and reiterated his recommendation that no increase be granted. The Board staff now concurred completely with Baar's analysis and recommended the Board adopt the $37.21 rent increase he recommended.
The Board reopened the hearing on Rainbow's application on February 21. At that hearing Rainbow raised the amount of its requested rent increase from $58.33 to $120 while Herzing continued to criticize Baar and requested a rent decrease. There was also additional testimony about loss of amenities and argument that the hearing was illegal. The Board continued the hearing to March 20.
On March 15 the Board staff issued a second supplemental staff report reaffirming its concurrence with Baar's recommendation of a $37.21 increase, including $11.80 for capital improvements. The report concluded any loss of amenities was minor, justifying no more than a $1 offset against any allowable increase. Prior to the March 20 hearing the Board also received additional reports from Baar and Herzing.
On March 20 the Board again reopened the hearing, at which time the staff reiterated its recommendation that the Board adopt Baar's recommendation; Herzing continued his criticism of Baar's analysis; loss of amenities was further discussed; and the legality of the hearing was again questioned. After all present were allowed to speak, the Board closed the hearing and voted to grant a rent increase of $36.21, which included a $11.80 capital improvement increase for 27 1/2 years.[4] The Board issued its formal findings and decision on March 27. The Board's resolution granting the rent increase discussed each of 11 factors required to be considered under the rent control ordinance.
*1165 On April 30 Rainbow filed a motion for administrative mandamus in the instant action challenging the Board's March 1996 decision to grant a rent increase of $36.21. The court heard the matter and ruled that (1) Rainbow's original challenge to the Board's January 1995 $6 rent increase was mooted when the parties stipulated that the Board could rescind its original decision and rehear the matter, and (2) the Board's March 1996 rent increase of $36.21 was supported by substantial evidence. The court entered judgment denying Rainbow's petition for administrative mandamus and dismissing the action with prejudice.

DISCUSSION

I. Standard of Review

(1) Appellate review of a decision by a mobilehome rent control board is governed by the substantial evidence standard. (Westwinds Mobile Home Park v. Mobilehome Park Rental Review Bd., supra, 30 Cal. App.4th at p. 90.) Regarding the Escondido rent control ordinance, this court has noted the substantial evidence question is whether the rental rate granted by the Board "provided a `fair rate of return on the cost of that applicant's equity investment.' [Citation.]" (Id. at pp. 90-91.)

II. Exclusion of Utility Improvement Costs From Capital Expenses

(2) Rainbow's main contention in this appeal is that the Board erred by excluding $223,847 Rainbow spent to improve the park's gas and electric utility systems from consideration as capital improvement costs.

A. Public Utilities Commission Ruling

The Board ultimately accepted Baar's analysis and conclusion regarding an appropriate rent increase for capital improvements. Baar excluded gas and electric improvements from consideration as capital improvements based on a published decision of the Public Utilities Commission (PUC) entitled Re Rates, Charges, and Practices of Electric and Gas Utilities Providing Services to Master-metered Mobile Home Parks (1995) 58 Cal.P.U.C.2d 709 (Rates, Charges, and Practices).
In Rates, Charges, and Practices, supra, the PUC explained: "Most mobile home park owners take gas and electric service through a master-meter. The park owners, in turn, submeter service to their tenants. To at least partially cover the cost of submetering, the serving utility's master-meter rate schedules provide a submetering discount to the park owners.
*1166 "[Public Utilities Code section] 739.5 regulates the rates that master-metered mobile home parks with submetered utility systems may charge their tenants. This code section requires master-metered mobile home parks to charge tenants at the same rate the utility would charge the tenants for direct service. The discount is intended to cover the `average costs' of park owners to provide submetered service, but is not to exceed the `average cost' of the serving utility to provide comparable service to tenants directly served by the utility. The park owner must maintain and, as necessary, replace the distribution system beyond the master-meter. In addition, the park owner must maintain and read the submeters and provide each submeter customer with an itemized billing similar in form and content to bills provided by the public utility. Basically, within the mobile home park, the park owner performs the functions (except some emergency and safety functions) of the public utility." (Rates, Charges, and Practices, supra, 58 Cal.P.U.C.2d at p. 710, fns. omitted.)
The PUC concluded master-metered park owners are barred from recovering the costs of improving their gas and electric systems through rent increases because Public Utilities Code[5] section 739.5 expressly limits their recovery of such costs to the amount derived from the submetering discount. (Rates, Charges, and Practices, supra, 58 Cal.P.U.C.2d at p. 717.) The PUC focused on the language in section 739.5, subdivision (a), stating that "`the master-meter customer shall charge each user of the service at the same rate which would be applicable if the user were receiving gas or electricity, or both, directly from the gas or electrical corporation.'" (Rates, Charges, and Practices, supra, at pp. 717-718, quoting § 739.5, subd. (a), original italics.) The PUC further noted section 739.5, subdivision (a) caps the submeter discount "`at a level which will provide a sufficient differential to cover the reasonable average costs to master-meter customers of providing submeter service, except that these costs shall not exceed the average costs that the corporation would have incurred in providing comparable services directly to the users of the service.'" (Rates, Charges, and Practices, supra, at p. 718, quoting § 739.5, subd. (a), original italics.)
The PUC concluded: "The plain language of the statute allows (1) for recovery of master-meter costs only up to the average cost that the utility would have incurred were it to provide service to the master-meter customer, and (2) that the master-meter customer charge each user of the service at the same rate that user would pay were he a direct utility customer." (Rates, Charges, and Practices, supra, 58 Cal.P.U.C.2d at p. 718.) Consequently, "tenants of master-metered parks shall not be subject to utility cost rent *1167 surcharges for ongoing utility system repair and replacement. Master-meter customers are compensated in the manner and to the extent directed by [section] 739.5[, subdivision] (a), which provides a reasonably accessible means to obtain a return on property. There is no need to establish a procedure for individual parks to obtain rate increases to offset reasonably incurred uncompensated system replacement costs...." (Ibid.)
In short, if submetered mobilehome tenants were required to pay the cost of maintaining and improving gas and electric systems through rent increases in addition to paying the park owner the same rate that would apply if they were receiving gas and electricity directly from a gas or electric company, they would effectively be paying more for gas and electricity than directly metered customers in contravention of section 739.5. For that reason the PUC in Rates, Charges, and Practices, supra, prohibited park owners from recovering the cost of maintaining and improving gas and electric systems from submetered tenants through rent increases.

B. Applicability of the PUC Ruling

Rainbow contends Rates, Charges, and Practices, does not apply to a park subject to a rent control ordinance. There are only two statements in Rates, Charges, and Practices that could possibly be interpreted as excluding rent-controlled parks from its ruling. First, after noting its "complete jurisdiction over utility rates, including the mobile home park discount ... [and its] responsibility for adjudicating complaints that allege violation of [section 739.5's] requirement that the `master-meter customer shall charge each user of the service at the same rate which would be applicable if the user were receiving gas or electricity, or both, directly from the gas or electrical corporation[,]'" the PUC stated: "However, we fully accept and embrace the fact that the [PUC] has no `rent control' jurisdiction over mobile home parks and park owners." (Rates, Charges, and Practices, supra, 58 Cal.P.U.C.2d at p. 718.)
We agree with the Board's suggestion that in making that reference to rent control, the PUC was merely acknowledging its task is to control utility rates, not rent. Accordingly, its prohibition against recovering gas and electricity costs from submetered tenants through rent surcharges should not be construed as rent control but rather as utility-rate control.
That the PUC lacks rent control jurisdiction does not mean rent control boards are free to ignore its rulings concerning utility rates. The rationale of Rates, Charges, and Practices applies to rent-controlled parks as much as to parks that are not subject to rent control. Section 739.5, subdivision (a), as *1168 interpreted by the PUC, precludes master-metered park owners from recovering the costs of repair and maintenance of gas and electric systems through rent whether such surcharges are unilaterally imposed by a park owner or authorized by a rent control board. There is no language in the statute that suggests it does not apply to parks subject to rent control. If the PUC was of the opinion that section 739.5, subdivision (a), was inapplicable to rent-controlled parks, it presumably would have made that clear in Rates, Charges, and Practices.[6]
The other reference to rent control in Rates, Charges, and Practices followed the PUC's statement that park owners who are "aggrieved by [section 739.5] have every right to seek legislative amendment to authorize the recovery of additional charges by mobilehome park operators." (Rates, Charges, and Practices, supra, 58 Cal.P.U.C.2d at p. 718.) The PUC added: "As to mobilehome parks subject to rent control ordinances, those owners may seek amendments to the applicable ordinances to authorize specific types of infrastructure improvements necessary to preserve the quality of utility service to their mobilehome tenants." (Id. at pp. 718-719.) To the extent this statement suggests local ordinances can override the PUC's proscription against recovering utility maintenance and improvement costs through rent increases, it is incorrect, as an order of the PUC controls over a local ordinance where the two conflict. (Orange County Air Pollution Control Dist. v. Public Util. Com. (1971) 4 Cal.3d 945, 950 [95 Cal. Rptr. 17, 484 *1169 P.2d 1361].)[7] The PUC's reference to seeking amendment of the "applicable ordinances" is ambiguous dictum which has no effect on the essential ruling and rationale of Rates, Charges, and Practices.[8]
The Board correctly viewed Rates, Charges, and Practices as precluding Rainbow's recovery of its expenditures on gas and electric improvements through a rent increase. Even if section 739.5 and Rates, Charges, and Practices were inapplicable to rent-controlled parks, the Board still had the discretion to apply the reasoning of Rates, Charges, and Practices and limit Rainbow's recovery of utility improvement costs to the income it obtained through its submeter discount.

C. Constitutionality of PUC Ruling

Rainbow contends the PUC's decision in Rates, Charges, and Practices is unconstitutional because it may operate in a confiscatory fashion. However, *1170 we are not at liberty to review the constitutionality of Rates, Charges, and Practices. Only the California Supreme Court has jurisdiction to review orders of the PUC issued before January 1, 1998. (§ 1759;[9]Barnett v. Delta Lines, Inc. (1982) 137 Cal. App.3d 674, 681 [187 Cal. Rptr. 219]; Hickey v. Robey (1969) 273 Cal. App.2d 752, 763 [77 Cal. Rptr. 486].)
Certain mobilehome park owners filed applications for rehearing in Rates, Charges, and Practices, arguing, among other things, that the PUC's ruling infringed their right to contract and resulted in an unlawful taking. (Re Rates, Charges, and Practices of Electric and Gas Utilities Providing Services to Master-metered Mobile Home Parks (1995) 61 Cal.P.U.C.2d 225, 226-227.) The PUC rejected these constitutional challenges and denied the applications for rehearing. (Id. at pp. 227-232.) The park owners then sought review by the California Supreme Court. The Supreme Court denied review on October 6, 1996 (S048893) sub nom. Western Mobilehome Parkowners Assn. v. Public Utilities Commission. Consequently, we are bound by the PUC's interpretation of section 739.5 in Rates, Charges, and Practices. (Hickey v. Robey, supra, 273 Cal. App.2d at pp. 763-764 ["Though an order of the [PUC] be palpably erroneous in point of law, until it is annulled by the Supreme Court, it is binding ... on all courts of this state. [Citations.]"].)

III. Sufficiency of the Evidence

(3) Apart from objecting to Baar's exclusion of utility expenditures from capital improvements, Rainbow raises no other challenge to the sufficiency of the evidence to support Baar's MNOI analysis. The staff report and Board's resolution granting the rent increase adopted Baar's approach and considered each of 11 factors required to be considered under Escondido's rent control ordinance, including increase in the CPI, comparable rents, capital improvements, income and expenses. The Board's decision was the result of thorough expert analysis of the relevant evidence and exhaustive debate over its proper use in the Board's fair return determination. The evidence sufficiently supports the Board's finding that Baar's recommended increase, less $1 for loss of amenities, provided Rainbow a fair return on its equity investment.

*1171 IV. Return on Depreciated Net Book Assets

Although the Board adopted Baar's MNOI approach and rent-increase recommendation, it noted the increase it approved also fell within the range of increases recommended by Gibson and, therefore, provided a fair return under his historical cost/book value approach as well.
Rainbow takes issue with Gibson's "historical cost" analysis because in making his ultimate rent increase recommendations, Gibson relied on Brabant's appraised value of the park at the time of acquisition of $3,685,000 rather than Rainbow's actual acquisition cost of nearly $5 million.[10] Rainbow cites a financial analysis of the park done by Brinig & Company at the Board's request in connection with the January 1995 proceedings resulting in the $6 rent increase. The Brinig report determined the net book value of the park's assets at the end of 1993 was $5,197,721 and the park's net operating income for 1993 was $280,699. Based on these figures, the Brinig report noted the net operating income was 5.4 percent of the net book assets. Rainbow contends the Board should have approved a rent increase that would raise Rainbow's operating income to 10 percent of $5,197,721, because this court in Yee noted the same Board assumed a fair rate of return in that case was 10 percent. (Yee v. Mobilehome Park Rental Review Bd., supra, 17 Cal. App.4th at p. 1103.) This contention is without merit.
It is clear from the record the Board adopted Baar's MNOI analysis in determining the amount of rent increase needed to provide Rainbow a fair rate of return. The Board merely noted in passing that the approved rent increase also fell within the range of Gibson's recommendations. Because there is substantial evidence to support the finding that Baar's MNOI *1172 approach and resulting rent increase provided Rainbow a fair return, we need not address Rainbow's objections to Gibson's analysis or its contention it is getting an insufficient rate of return on depreciated net book assets.
(4) As this court has repeatedly noted, "... there is no single constitutionally required formula which must be utilized when government seeks to regulate the price charged for a good or service. [Citation.] ... [A] governmental entity may choose to regulate pursuant to any fairly constructed formula even though other proper formulas might allow for higher prices." (Palomar Mobilehome Park Assn. v. Mobile Home Rent Review Com. (1993) 16 Cal. App.4th 481, 487 [20 Cal. Rptr.2d 371], italics added; Yee v. Mobilehome Park Rental Review Bd., supra, 17 Cal. App.4th at p. 1104; San Marcos Mobilehome Park Owners' Assn. v. City of San Marcos (1987) 192 Cal. App.3d 1492, 1498 [238 Cal. Rptr. 290].) The United States Supreme Court held: "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end." (Power Comm'n v. Hope N Gas Co. (1944) 320 U.S. 591, 602 [64 S.Ct. 281, 288, 88 L.Ed. 333].)
"A `just and reasonable' rate of return is one high enough to encourage good management, reward efficiency, discourage the flight of capital, and enable operators to maintain their credit, and which is commensurate with returns in comparable enterprises, but which is not so high as to defeat the purpose of rent control to prevent excessive rents. [Citation.] There is a range of rents which can be charged, all of which could be characterized as allowing a `just and reasonable' return. [Citations.] Thus, many decisions by rent control boards will focus on the issue of where the requested increases fall within the range of possible rents  all of which rents would allow the owner a return sufficiently `just and reasonable' as to not be constitutionally confiscatory." (San Marcos Mobilehome Park Owners' Assn. v. City of San Marcos, supra, 192 Cal. App.3d at pp. 1502-1503.)
Baar's MNOI approach adopted by the Board is a "fairly constructed formula" which provided Rainbow a sufficiently "just and reasonable" return on its investment. "The [MNOI] approach has been praised by commentators for both its fairness and ease of administration. [Citations.]" (Palomar Mobilehome Park Assn. v. Mobile Home Rent Review Com., supra, 16 Cal. App.4th at p. 486.) The Board was not obliged to reject Baar's MNOI analysis just because an historical cost/book value formula using Rainbow's actual cost of acquisition and a 10 percent rate of return would have yielded a higher rent increase.

*1173 DISPOSITION
The judgment is affirmed.
Nares, Acting P.J., and McDonald, J., concurred.
Appellant's petition for review by the Supreme Court was denied August 19, 1998. Baxter, J., did not participate therein.
NOTES
[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] References to dollar amounts of rent increase are to the amount per month per space. Rainbow's first application resulted in an increase of $7 in 1992. In 1989 the Board granted the park's previous owner an increase of about $22.
[2] The Board demurred to and moved to strike the second cause of action of Rainbow's first amended petition in which Rainbow alleged it was denied a fair hearing because the Board was composed of members of the city council. The court sustained the demurrer and granted the motion to strike with leave to amend. Rainbow chose not to amend the second cause of action. Consequently, the action proceeded on the first cause of action alleging the Board's findings were not supported by the evidence.
[3] The staff's harmonizing approach was as follows: The highest recommended increase (Gibson's $58.33) and the lowest recommended increase (presumably Herzing's) were discarded, leaving the following four components: $45.17 (Gibson's low), $12.90 (60 percent of CPI), $37.21 (Baar's low) and $49.08 (Baar's high). These were added together and the total ($144.36) was divided by four, resulting in the recommended increase of $36.09.
[4] The Board decreased Baar's recommendation by $1 to reflect its concern for the loss of amenities.
[5] All further statutory references are to the Public Utilities Code.
[6] In Steiner v. Palm Springs Mobilehome Properties (1997) Cal.P.U.C. Decision No. 97-07-009 [1997 WL 449535], cited by the Board at oral argument, the PUC confirmed that its ruling in Rates, Charges, and Practices applies to a mobilehome park subject to a rent control ordinance. Steiner involved a mobilehome park resident's challenge to an increase in natural gas utility charges approved by the Rent Review Commission of the City of Palm Springs. The PUC ruled that "to the extent the Rent Commission has ordered a `rent' increase to cover the costs of the natural gas submeter system incurred by the Sahara Mobilehome Park ..., the Rent Commission has impermissibly intruded on the constitutional and statutory ratemaking authority of the [PUC]." (Id. at p. [*]2.) The PUC held that "a mobilehome park owner ... is prohibited from collecting utility costs from tenants, no matter what the rubric under which the utility costs are charged, except for those costs included in the applicable residential tariff of the serving public utility...." (Ibid.) Noting the state through the PUC has occupied the field of regulating costs paid for utility services by residents and owners of mobilehome parks, the PUC concluded "... the Rent Commission may not intrude in this area of regulation. The Rent Commission's order in question in this proceeding is, therefore, unconstitutional because it directly conflicts with both the current ... tariffs applicable to Sahara Park and its tenants and the orders in [Rates, Charges, and Practices]. Just as the Rent Commission does not have authority to approve the tariffs of [utility companies], by the plain language of section 739.5, it is preempted from ordering the rates and charges Sahara Park tenants pay for utility service ... notwithstanding the label applied to [the] order." (Steiner, supra, at p. [*]9.) The PUC denied the park owner's application for rehearing of the Steiner decision, rejecting, among other arguments, various constitutional objections to the decision. (Steiner v. Palm Springs Mobilehome Properties (1997) Cal.P.U.C. Dec. No. 97-11-033 [1997 WL 797198].)
[7] Rainbow argues the PUC's rulings are not binding on the Board because the PUC acts only in a legislative capacity, and a legislative determination cannot bind a trier of fact in a quasi-adjudicatory, evidentiary, rate-setting hearing. The logical extension of Rainbow's argument is that courts are not bound by statutes, which of course is not true. In any event, the PUC does not act only in a legislative capacity; its authority has been liberally construed, and includes judicial as well as legislative and administrative powers. (San Diego Gas & Electric Co. v. Superior Court (1996) 13 Cal.4th 893, 915 [55 Cal. Rptr.2d 724, 920 P.2d 669].)
[8] In Steiner the PUC clarified its ordinance amendment reference as follows: "We note that with respect to the exclusivity of this Commission's mandate, the Rent Commission misapprehended the meaning of one sentence in [our decision in Rates, Charges, and Practices] where we observed that mobilehome park `owners may seek amendments to the applicable [rent control] ordinances to authorize specific types of infrastructure improvements necessary to preserve the quality of utility service to their mobilehome park tenants.' ... The Rent Commission apparently misinterpreted and unduly extended the import of this statement to infer that we conceded a local rent control ordinance could set the costs of utility service to be paid by the tenants by authorizing infrastructure improvements for utility service.

"To clarify this point: we did not mean, and we are not authorized to propose, that a local ordinance could or may preempt the ratemaking authority vested in the Commission by the State's Constitution and statutory law. Our intention was only to suggest that some infrastructure improvements which may affect a mobilehome park and other surrounding properties, such as costs for a flood diversion project, may be considered by the park owner to preclude future submeter system maintenance costs. By applying the standard rules of text construction, our statement cannot mean, and obviously was not intended to mean, anything which contradicts or is inconsistent with the explicit Conclusions of Law and the express orders of [Rates, Charges, and Practices] prohibiting submeter system costs in rent charges.... [¶] [O]ur [decision in Rates, Charges, and Practices] prohibiting the mobilehome park owners from recovering submeter system costs from the park tenants in rent or other charges not approved by [the PUC] was upheld by the California Supreme Court.... Therefore, the Rent Commission directly contravened a duly established final order of this Commission, and impermissibly intruded in the area of utility ratesetting. It is well-established that this Commission's orders may not be hindered, evaded, or ignored. [Citations.]" (Steiner v. Palm Springs Mobilehome Properties, supra, Cal.P.U.C., Dec. No. 97-07-009) [1997 WL 449535 at p. [*]10].)
[9] By a 1996 amendment to section 1759 the Legislature extended jurisdiction to review PUC orders to the Courts of Appeal. However, the amendment applies only to review of orders and decisions effective on or after January 1, 1998. PUC orders and decisions effective before that date, such as Rates, Charges, and Practices, are reviewable only by the Supreme Court under the previous version of section 1759. (See Historical and Statutory Notes, 57A West's Ann. Pub. Util. Code, § 1759 (1998 pocket supp.) p. 18.)
[10] The acquisition cost of a park is a key component in the historical cost approach to calculating a fair rate of return. In Yee v. Mobilehome Park Rental Review Bd. (1993) 17 Cal. App.4th 1097 [23 Cal. Rptr.2d 1], this court explained: "The `historical cost' standard treats the actual cost of the property including that represented by encumbrances (the rough equivalent of book value) as the `investment' and the net operating income with no deduction for interest paid on encumbering debt as the `return.'" (Id. at p. 1104, fn. 5.) To determine a park's annual rate of return under this approach the park's "operating profit" (net income plus interest expenses) is divided by the net book value of the "investment" (acquisition cost plus capital improvements minus accumulated depreciation). (Westwinds Mobile Home Park v. Mobilehome Park Rental Review Bd., supra, 30 Cal. App.4th at pp. 91-92.)

Gibson's report supplemented the "normal return on total book assets method" with a return on assets using an "imputed park value as a means to estimate true imputed book assets." The imputed park value was based on Brabant's appraised value of the park at the time of purchase or $3,685,000. Gibson's report concluded: "Under our rate of return scenarios, all of the book value estimates for a rent increase should be highly discounted because of (1) the inflated and uncertain nature of the park sales price...."