[No. A097737. First Dist., Div. Two. Apr. 1, 2003.]

HILLSBORO PROPERTIES, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
ROBERT HAMBLY et al., Real Parties in Interest.

[No. A098327. First Dist., Div. Two. Apr. 1, 2003.]

WESTERN MANUFACTURED HOUSING COMMUNITY
ASSOCIATION, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
ROBERT HAMBLY et al., Real Parties in Interest.

**COUNSEL**

Spangenberg & Ritson, David C. Spangenberg and Lark L. Ritson for Petitioner Hillsboro Properties.

Anderson & Poole, Edward G. Poole and Deidre Von Rock for Petitioner Western Manufactured Housing Community Association.

Gary M. Cohen, Mary F. McKenzie, William N. Foley, Carrie G. Pratt, Peter Arth, Jr., and Helen W. Yee for Respondent.

Endeman, Lincoln, Turek & Heater, James C. Allen and Kimberly K. Harris for Real Parties in Interest.

## OPINION

## LAMBDEN, J.—

### I. INTRODUCTION

These related petitions[1] challenge the Public Utilities Commission's (PUC) exercise of jurisdiction pursuant to, and its interpretation of, Public Utilities Code section 739.5.[2] That section controls the utility rates mobile-home park owners and other landlords may charge their tenants where the utility company does not service the tenants directly, but rather provides natural gas and electricity service to the landlord, who in turn distributes service to the tenants. Tenant Robert Hambly (Hambly), for himself and on behalf of the residents of Los Robles Mobilehome Park (Los Robles), filed a complaint against the City of Novato (City) and Hillsboro Properties (Hillsboro), the owner of Los Robles. The PUC determined that Hillsboro had assessed annual rent increases that, although authorized by the City under its municipal rent control ordinance, increased the rates for electricity and natural gas service in violation of section 739.5. Petitioners make numerous arguments that can be reduced to two key issues: (1) whether the PUC has improperly usurped the City's rent control jurisdiction; and (2) whether the PUC erred in interpreting section 739.5 to prohibit Hillsboro from passing through certain utility costs to its tenants in the form of rent increases without first obtaining PUC authorization to do so.

We conclude the PUC was correct in all respects. By ordering Hillsboro to recalculate its net operating income to exclude income and expenses from tenant gas and electricity usage and rent increases to exclude certain utility improvement costs, the PUC has exercised its ratemaking authority and has not exceeded its jurisdiction. In addition, the PUC's determination that issues related to utility rates pursuant to section 739.5 must be raised in a context broader than a complaint proceeding comports with statutory language and intent, is consistent with several prior decisions, and is within the PUC's discretion.

---

[1] Hillsboro Properties petitions for writ of review; Western Manufactured Housing Community Association (WMA) petitions for alternative writ of mandate.

[2] Except as otherwise indicated, all further statutory references are to the Public Utilities Code.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Hillsboro owns nine mobilehome parks in California, including the 213-space Los Robles in Novato. Los Robles is a submetered park, meaning that Pacific Gas and Electric Company (PG&E) delivers electricity and natural gas to a master meter and bills its master-meter customer, Hillsboro. Tenants receive natural gas and electricity via a submeter system within the park that is owned, serviced and administered by Hillsboro.

PG&E charges Hillsboro for total park natural gas and electricity service in a bill that does not separate tenant usage from common area usage (e.g., pool, clubhouse, overhead street lighting). In accordance with section 739.5, Hillsboro's master-meter bill from PG&E contains a per-space, per-day submeter discount that represents the costs PG&E avoids by not providing the submeter service directly to the tenants. Hillsboro provides its tenants with an itemized monthly bill for gas and electricity based on each tenant's usage. As required by section 739.5, subdivision (a), Hillsboro charges its tenants at the same rate PG&E would charge for residential service if it were providing the services directly. Because of the submeter discount, Hillsboro's monthly receipts from tenants for their utility usage, which does not include common area usage, exceed the total amount Hillsboro pays each month to PG&E for total park usage.

Mobilehome parks in Novato are subject to the City's mobilehome rent control ordinance (the Ordinance). The Ordinance provides for an automatic annual rent adjustment by a percentage of the annual change in the consumer price index (CPI). If a park owner concludes that this adjustment does not provide a fair return, the owner may petition for an individual adjustment based on a maintenance of "net operating income" (NOI) formula. The Ordinance defines NOI as gross income less operating expenses. Gross income is defined to include gross rents, interest from security deposits, and all other income or consideration received or receivable in connection with the operation of the park. Operating expenses are defined to include utility costs not paid by the tenants and to exclude any expense for which the owner has been reimbursed from a source other than rental income.

Rent increases are based on a park's NOI for base year 1995, the last full calendar year before rent control took effect. It is presumed that the NOI for the base year provided the owner with a fair return on the property. The base year NOI is adjusted by the difference between the CPI in the base year and the CPI in the rent increase petition year. If the park owner's petition year NOI is less than the base year NOI adjusted for inflation, a rent increase is granted to restore a "fair return."

As approved by the City, Hillsboro calculated its 1995 base year NOI by including submetered utility receipts from tenants as an item of gross income and the master-meter utility bill (total park usage) as an operating expense. In its 1996 rent increase petition, Hillsboro sought to pass through to tenants in the form of a rent increase certain costs, including costs associated with trenching and laying conduit for overhead street lighting in the amount of $3,251. The City approved inclusion of these costs as part of the 1996 rent increase petition. The City also approved Hillsboro's 1998 rent increase petition, which included $23,884 in costs related to repairing and replacing electric pedestals (structures that support the service panels through which mobilehomes connect to the electricity supply). The rent control hearing officer authorized the inclusion of these expenses based on evidence from Hillsboro that the submeter discount did not take them into account.

The City's decisions approving Hillsboro's 1995 base year NOI and its 1996 and 1998 rent increase petitions, which included the base year NOI adjusted for inflation and certain utility costs, became final. No party sought judicial review through a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5.

Hambly's complaint alleged that, as a result of the City's rent control process, tenants at Los Robles were being "charged more for gas and electricity service than directly metered customers." Hambly contended that Hillsboro improperly included income from submetered utility service in its base year NOI. As a result, tenants pay twice for submetered service: (1) they first pay regular monthly bills for utility usage; (2) they then also pay in the form of rent increases that are "inflated by using the 1995 net operating income (which includes income from submetered utility service) as a multiplier to calculate such raises." Hambly also contended that Hillsboro improperly passed through its costs for common area lighting and electric pedestals to tenants in the form of rent increases. The rent increases resulted in double reimbursement to Hillsboro because the submeter discount already compensated Hillsboro for operating and maintaining the submeter service.

Hambly sought an order prohibiting Hillsboro from charging its tenants more than directly metered customers pay for utilities and requiring that Hillsboro refund to tenants all excess charges from January 1997 to present. Hillsboro filed an answer denying that its tenants were charged more and claiming the PUC was "without jurisdiction to interfere with the rights conferred upon Hillsboro by virtue of the legislative enactment of the [City's] Rent Control Ordinance."

During preliminary proceedings, the assigned administrative law judge (ALJ) and the assigned commissioner both ruled that the PUC had subject

matter jurisdiction to resolve the complaint. The Golden State Manufac-
tured-Home Owners League intervened in support of Hambly. Later, the
ALJ permitted WMA, a trade association of mobilehome park owners, to
intervene in support of Hillsboro. The presiding officer's decision (POD)
was against Hillsboro, which appealed to the commission on the principal
ground that the decision exceeded its jurisdiction. On August 23, 2001, the
PUC issued its decision (Dec. No. 1-08-040, hereafter Decision) affirming
the POD with certain changes and denied the appeals.

The PUC concluded that Hambly was correct in his allegation that the
inclusion of net utility income in NOI, although approved by the rent board,
resulted in higher gas and electricity charges to Los Robles tenants in
violation of section 739.5. It also concluded the costs for common area
lighting and electric pedestals should not have been included in the rent
increase petitions because Hillsboro did not follow the required procedure
for determining whether those costs could be passed through to tenants. The
PUC's Decision modified the POD's recommendation that Hillsboro apply
to the City for a rent adjustment. Out of deference to the City's assertion that
its municipal code lacked a mechanism to reopen a final rent determination,
the PUC ordered Hillsboro to make the refund calculations itself. Finally, the
Decision directed the parties to meet and confer to try to agree on the
methodology for calculating the refunds and provided for additional pro-
ceedings, if necessary, to resolve that issue.

Specifically, the PUC ordered Hillsboro to refund on a pro rata basis the
difference between the rent actually charged and the rent that should have
been charged in the three years preceding the filing of the complaint (the
period beginning Jan. 13, 1997). The ordering paragraphs direct Hillsboro to
recalculate the 1995 base year NOI and the NOI in each petition year to (1)
exclude submetered gas and electricity receipts as an item of gross income;
(2) exclude the master-meter bill as an item of operating expense; and (3)
include as an item of operating expense the common area usage of gas and
electricity calculated on the basis of the master-meter rate schedule in the
tariffs of PG&E that were in effect at the time.

The order also requires that $3,251 in expenses for trenching and conduit
for common area lighting be removed from the 1996 rent increase petition
and that $23,884 in expenses related to electric pedestals be removed from
the 1998 petition. The PUC recommended (but did not order) that Hillsboro
"examine its practices" at its other master-metered mobilehome parks,
"amend its future rent control applications where appropriate, and . . .
implement refunds where warranted."

In addition, the PUC recommended (but did not order) that the City amend
its rent control ordinance in accordance with the Decision: "We conclude

that rent refunds are warranted and will require that they be based on the same methodology we urge Novato to adopt going forward in order to disentangle CPUC utility rate setting jurisdiction and its own rent control jurisdiction, as it must."

Hillsboro and WMA sought rehearing, which the PUC denied.[3] These timely writ petitions followed.

## III. DISCUSSION

### A. *Standard of Review*

Section 1756 provides that "any aggrieved party may petition for a writ of review in the court of appeal . . . ." As pertinent here, the court's review of a PUC decision is limited to whether: (1) the commission acted without jurisdiction or in excess of its jurisdiction; (2) the commission has not proceeded in the manner required by law; (3) the decision of the commission is not supported by the findings; (4) the findings in the decision of the commission are not supported by substantial evidence in light of the whole record; (5) the order or decision was an abuse of discretion; (6) the order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution. (§ 1757.) ■ The PUC's decisions are presumed valid. (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410-411 [67 Cal.Rptr. 97, 438 P.2d 801].)

■ The interpretation of a statute is a question of law, subject to independent review. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) As to constitutional questions, the court exercises independent judgment on the law and the facts. (§ 1760.)

### B. *Petitioners' Arguments*

Hillsboro contends that the PUC, without finding a conflict between a general law and the local ordinance, invaded the City's rent control jurisdiction, violating the City's rights under the California Constitution. Hillsboro also contends that the PUC acted without jurisdiction or in excess of its jurisdiction when it reviewed a final order of the City's rent board. Hillsboro next argues that the PUC's revision of the rent control formula violated Hillsboro's constitutional rights because the City's formula is "set at a level

---

[3]The City did not file an application for rehearing, and has not petitioned for review by this court.

which will avoid a confiscatory taking of the owner's property and satisfy federal and state constitutional requirements." Finally, Hillsboro contends that, because it presented evidence to the rent board that costs associated with trenching and laying conduit for common area lighting and with electric pedestals are not compensated for by the submeter discount, there is no substantial evidence supporting the PUC's order that those costs be disallowed as part of Hillsboro's rent increase petitions.

WMA also argues that the PUC has usurped the authority of the rent board. In addition, WMA contends that the PUC has misinterpreted section 739.5, that the section does not confer exclusive jurisdiction upon the PUC to determine the utility charges park owners can pass through to their tenants, and that it does not limit the utility costs park owners can recover solely to the costs covered by the submeter discount. Finally, WMA argues that section 739.5 does not empower the PUC to regulate mobilehome park owners or to order refunds.[4]

C. *The PUC's Interpretation of Section 739.5*

The relevant portion of the statute at issue is section 739.5, subdivision (a), which provides: "The commission shall require that, whenever gas or electric service, or both, is provided by a master-meter customer to users who are tenants of a mobilehome park, apartment building, or similar residential complex, the master-meter customer shall charge each user of the service at the same rate which would be applicable if the user were receiving gas or electricity, or both, directly from the gas or electrical corporation. The commission shall require the corporation furnishing service to the master-meter customer to establish uniform rates for master-meter service at a level which will provide a sufficient differential to cover the reasonable average costs to master-meter customers of providing submeter service, except that these costs shall not exceed the average cost that the corporation would have incurred in providing comparable services directly to the users of the service."

The statute thus requires PG&E (and other utility companies) to discount its rates to master-meter landlords by an amount that covers the reasonable

---

[4]The PUC argues that WMA's application for rehearing below did not raise the arguments regarding statutory construction that it now raises in its petition before this court, and that this should preclude consideration of these arguments. A party may not raise in court any matter that was not presented to the PUC on application for rehearing. (§ 1732; *Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1101, fn. 7 [102 Cal.Rptr.2d 684].) The PUC is correct and the arguments will not be considered, with the exception of WMA's contentions regarding whether reimbursement is limited to the submeter discount. We conclude that WMA sufficiently raised the issue in its application for rehearing when it argued that the common area and electric pedestal costs are recoverable in rent because they "have never been the responsibility of PG&E and thus have always been considered to be excluded from the discount."

average cost incurred by the landlord in distributing energy to the tenants (not to exceed the average cost avoided by the utility) and requires the landlord to charge its tenants the same rates PG&E charges its directly served residential customers.

In 1995, in an investigatory proceeding, the PUC construed section 739.5, subdivision (a), to preclude mobilehome park owners from recovering costs associated with submetered utility systems from their tenants in the form of rent increases. (*Re: Rates, Charges, and Practices of Electric and Gas Utilities Providing Services to Master-metered Mobile Home Parks* (1995) 58 Cal.P.U.C.2d 709, 717-718 [Dec. No. 95-02-090]; rehg. den., 61 Cal.P.U.C.2d 225 [Dec. No. 95-08-056] (*Rates, Charges and Practices*).)[5] Interpreting the language of the statute, the PUC concluded that section 739.5, subdivision (a) "expressly limits a master-metered mobile home park customer's recovery of reasonable incurred costs of owning, operating, and maintaining a submetered system to the reimbursement provided by the submetering discount." (58 Cal.P.U.C.2d at p. 720.)

"To conclude otherwise would result in submetered park tenants having to pay more for their utility services, in the form of rent increases, than those nonsubmetered park tenants who receive utility services directly from the gas or electrical corporation. This would be contrary to the statute and the legislative intent because mobile home park owners would be charging their submetered tenants a different rate than tenants directly receiving service from the utility. The statute requires the 'same rate.' [Citation.] In enacting this statute, the Legislature intended that the tenants be indifferent whether they received utility services under a submetered system or directly from the utility, and thus, the intent was to limit the recovery of costs related to the submetered system to what is provided in the statute." (*Rates, Charges and Practices* [order denying rehearing], *supra*, 61 Cal.P.U.C.2d at p. 228.) In its principal decision, the PUC stressed its exclusive jurisdiction over utility rates and the amount recoverable by park owners for submetered system costs. (*Rates, Charges and Practices*, *supra*, 58 Cal.P.U.C.2d at pp. 718, 720.) This decision became final when the Supreme Court denied review on October 6, 1996 (S048893) *sub nom. Western Mobilehome Parkowners Assn. v. Public Utilities Commission*.

Ours is not the first case to apply these principles in a mobilehome rent control setting. The Fourth District has observed that the PUC's interpretation of section 739.5 in *Rates, Charges and Practices* is binding. (*Rainbow Disposal Co. v. Escondido Mobilehome Rent Review Bd.* (1998) 64

[5]WMA was a party to *Rates, Charges and Practices*; its application for rehearing was extensively discussed in the PUC's order denying rehearing, *supra*, 61 Cal.P.U.C.2d 225.

Cal.App.4th 1159, 1170 [75 Cal.Rptr.2d 746], review den. Aug. 19, 1998 (*Rainbow*).) " 'Though an order of the [PUC] be palpably erroneous in point of law, until it is annulled by the Supreme Court, it is binding . . . on all courts of this state.' "[6] (*Ibid.*, quoting *Hickey v. Roby* (1969) 273 Cal.App.2d 752, 763 [77 Cal.Rptr. 486].)

In *Rainbow*, a mobilehome park owner appealed a judgment denying its petition for writ of mandate challenging the adequacy of a rent increase approved by the local rent board. (*Rainbow, supra,* 64 Cal.App.4th at p. 1161.) The rent board disallowed certain utility expenses in accordance with the PUC's interpretation of section 739.5 in *Rates, Charges and Practices.* (*Rainbow, supra,* at p. 1165.) The *Rainbow* court held that the PUC's interpretation of section 739.5 applied to rent-controlled mobilehome parks and concluded that the rent board correctly viewed *Rates, Charges and Practices* as precluding the park owner's recovery of utility expenses through a rent increase. (*Rainbow, supra,* at pp. 1168-1169.)

The PUC has consistently applied its interpretation of section 739.5 in subsequent cases involving mobilehome parks and park owners' attempts to recover utility costs through rent charges. (See *Steiner v. Palm Springs Mobilehome Properties* (1997) 73 Cal.P.U.C.2d 369 [Dec. No. 97-07-009]; rehg. den. (1997) 76 Cal.P.U.C.2d 528 [Dec. No. 97-11-033]; petn. for writ of review den. S066434 (1998) (*Steiner*) [PUC ruled that park owner could only recover natural gas submeter system costs through submeter discount; rent increase approved by rent board was invalid to extent that it included costs related to submeter system]; *Home Owners Association of Lamplighter v. Lamplighter Mobile Home Park* (1999) 84 Cal.P.U.C.2d 727 [Dec. No. 99-02-001] (*Lamplighter*) [PUC ordered park owner to refund unlawful rent surcharges owner had assessed to pay for improvements to electrical submeter system].)[7]

D. *The PUC's Jurisdiction*

 Petitioners make several arguments to the effect that the PUC exceeded its jurisdiction by usurping the rent control authority of the City. Hillsboro defends the rent board's determinations, contending that the City

---

[6]Although in 1996 the Legislature amended section 1759 to extend jurisdiction to review PUC orders and decisions to the Courts of Appeal, the amendment applied only to review of decisions effective on or after January 1, 1998. Prior PUC decisions, such as *Rates, Charges and Practices*, are reviewable only by the Supreme Court under the previous version of the statute. (*Rainbow, supra,* 64 Cal.App.4th at p. 1170, fn. 9.)

[7]Although its petition to intervene was denied as untimely, WMA was listed as an interested party and actively monitored the proceedings in *Lamplighter*. (*Lamplighter, supra,* 84 Cal.P.U.C.2d at p. 738.)

acted within its constitutional powers in regulating rents, and that the PUC's Decision violates both the City's and Hillsboro's rights under article XI, section 7, of the California Constitution.[8] This provision of the California Constitution confers on a city or county the power to "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) Hillsboro contends that the City acted in accordance with this power in enacting the Ordinance and setting rent levels pursuant to rent control.

The PUC does not dispute the City's basic power to make and enforce local ordinances and regulations. The PUC has also acknowledged that, while it does have " 'complete jurisdiction over utility rates,' " it does not have " ' "rent control" jurisdiction over mobile home parks and park owners.' " (*Rainbow, supra,* 64 Cal.App.4th at p. 1167 [discussing *Rates, Charges and Practices*].) However, "[t]hat the PUC lacks rent control jurisdiction does not mean rent control boards are free to ignore its rulings concerning utility rates." (*Rainbow, supra,* at p. 1167.) As provided by the California Constitution, "[a] city, county, or other public body may not regulate matters over which the Legislature grants regulatory power to the Commission . . . ." (Cal. Const., art. XII, § 8.) The Legislature has delegated to the PUC the authority to regulate utility costs paid by submetered tenants as well as the rates utility companies can charge their master-metered customers. (§ 739.5.) Thus, when the PUC sets utility company tariffs and the submeter discount, it "acts pursuant to its exclusive jurisdiction and constitutional authority." (*Steiner, supra,* 73 Cal.P.U.C.2d at p. 375.)

Moreover, Hillsboro ignores an apparent conflict between the Ordinance and a "general law," section 739.5. (See Cal. Const., art. XI, § 7.) The Fourth District has noted that "an order of the PUC controls over a local ordinance where the two conflict." (*Rainbow, supra,* 64 Cal.App.4th at p. 1168, citing *Orange County Air Pollution Control Dist. v. Public Util. Com.* (1971) 4 Cal.3d 945, 950 [95 Cal.Rptr. 17, 484 P.2d 1361] [where a general law and a local ordinance conflict and the matter is one of statewide concern, the general law is controlling].) It is clear that the utility rates master-meter mobilehome park owners may charge to their tenants is a matter of statewide concern. Pursuant to the Ordinance, and in the absence of prior consideration of the matter by the PUC, the City made decisions as to whether Hillsboro could include certain types of utility income and expenses in calculating NOI and rent increases. To the extent that the Ordinance permits the City in the first instance to make rent determinations that impact utility rates charged to submetered tenants, it conflicts with section 739.5 and is controlled by it. (*Orange County Air Pollution Control Dist. v. Public Util. Com., supra,* at pp. 950-951.)

---

[8]Hillsboro does not address its standing to raise alleged violation of the City's constitutional rights.

Hillsboro also contends, in a related argument, that the PUC acted without jurisdiction or in excess of its jurisdiction when it reviewed the City's final administrative decisions and that the Decision constitutes an impermissible collateral attack. The tenants, it argued, were required to pursue their administrative remedies under Code of Civil Procedure section 1094.5; the now final decisions "are no longer subject to a court's review."

The flaw in Hillsboro's argument is that the City had no jurisdiction to make rent determinations that resulted in higher utility rates for Hillsboro's submetered tenants. In concluding that Hillsboro improperly included net utility revenue in its NOI calculation and utility costs in its rent increase petitions, the PUC was giving effect to section 739.5 and exercising its exclusive ratemaking authority, not rent control authority. (See *Rainbow*, *supra*, 64 Cal.App.4th at p. 1167.)

The PUC addressed a similar situation in *Steiner*, *supra*, 73 Cal.P.U.C.2d 369, in which a mobilehome park resident challenged the Palm Springs rent board's approval of a rent increase that included utility charges. The PUC ruled that the rent board had "impermissibly intruded on the constitutional and statutory ratemaking authority of this Commission." (*Id.* at p. 371.) Because the state through the PUC has occupied the field regulating the costs paid for utility services by mobilehome tenants and by park owners, the PUC concluded that the rent board's "order in question in this proceeding is, therefore, unconstitutional because it directly conflicts with both the current . . . tariffs applicable to [the mobilehome park] and its tenants, and the orders in [*Rates, Charges and Practices*]. Just as the Rent Commission does not have authority to approve the tariffs of [utility companies], by the plain language of section 739.5, it is preempted from ordering the rates and charges [the mobilehome park] tenants pay for utility service, including service delivered through a submeter system, notwithstanding the label applied to [the] order." (*Id.* at p. 376.)

Similarly here, the rent board acted without jurisdiction to set utility rates for mobilehome park tenants. While it would have been prudent for the Los Robles tenants to have filed a writ of mandate in the superior court to challenge the rent board's decisions, their failure to do so did not divest the PUC of jurisdiction.

In its Decision, the PUC took care not to overstep its jurisdiction. It recommended that the City amend the Ordinance to "disentangle CPUC utility rate setting jurisdiction and its own rent control jurisdiction" (Decision, at p. 15), but the ordering paragraphs are directed only to Hillsboro. It ordered Hillsboro to calculate the refunds in response to the City's assertion

that it could not reopen a final rent decision. (*Id.* at p. 26 [Finding of Fact, ¶ 10].) The PUC invalidated the rent increases approved by the City only to the extent that they included unauthorized utility costs and were based on maintaining 1995 net utility income. That the rent board's decisions became "final" when the tenants failed to seek a writ of administrative mandamus in the superior court does not change the fact that the City had no jurisdiction in the first place over utility rates that can be charged to mobilehome tenants.

■ Hillsboro next argues that the PUC's Decision impermissibly alters the NOI formula the City has chosen for calculating fair return and lowers the fair return rents Hillsboro is authorized to charge under the Ordinance. Hillsboro contends this is a violation of its rights under the "just compensation" clauses of both the California and United States Constitutions. The basis for this assertion of constitutional violation is the statement in the Ordinance that rents are "set at a level which will avoid a confiscatory taking of the owner's property and satisfy federal and state constitutional requirements." Hillsboro fails to present any evidence on this point or to explain how the Decision would work a taking of its property.

The PUC does not take issue with the NOI formula "per se, but only insofar as its application in the present case violates Section 739.5, prior Commission decisions and the principles articulated in *Rainbow.*" The Decision does not purport to alter the formula or invalidate the NOI methodology; it recommends that the City amend the Ordinance to bring it into compliance with section 739.5. (Decision, at p. 15.) Moreover, in *Rates, Charges and Practices*, the PUC ruled that its interpretation of section 739.5, generally limiting park owners to recovery of utility costs through the submeter discount, did not violate due process or the right of contract, and did not result in unlawful taking or confiscation. (*Rates, Charges and Practices, supra,* 61 Cal.P.U.C.2d at p. 227.) We agree.

■ Finally, we address Hillsboro's contention that the PUC erred in concluding that NOI for the base year and each petition year must be recalculated. At the evidentiary hearing, the parties' experts agreed that operation of the NOI formula as applied by Hillsboro and approved by the City resulted in higher gas and electricity charges to tenants in violation of section 739.5, but disagreed as to how to fix the problem. On behalf of Hillsboro, Michael St. John, Ph.D., proposed calculating the annual dollar value of the submeter discount and including it as an item of operating expense, which would reduce NOI by that amount. According to St. John, the tenants are overcharged only by this increment of NOI indexed by the CPI.

In prepared testimony on behalf of Hambly, Kenneth Baar, Ph.D., opined that Dr. St. John's approach was flawed because it still included gas and electricity income and expenses in fair return calculations, allowing the park owner to maintain in subsequent years the level of net income yielded by gas and electricity service in the base year. Dr. Baar proposed including only common area gas and electricity usage in the maintenance of net operating income formula in order to avoid conflict with the PUC'S jurisdiction over utility rates that may be charged to submetered tenants.

The PUC concluded that the record was insufficient to determine whether Dr. St. John's proposal would ensure compliance with section 739.5, and that the failure to produce evidence that would substantiate Dr. St. John's theory was Hillsboro's. It adopted Dr. Baar's methodology in order to "disentangle CPUC utility rate setting jurisdiction and [City's] rent control jurisdiction." At oral argument, Hillsboro contended that the PUC should have accepted Dr. St. John's proposal, but failed to sustain its burden on appeal to demonstrate that the PUC's decision was erroneous. We find that Dr. Baar's testimony provided substantial evidence in support of the PUC's findings and order to recalculate NOI.

E. *Reimbursement of Costs Not Included in the Submeter Discount*

 WMA argues that Hillsboro is entitled to the full amount of the rent increases authorized by the City because section 739.5 does not expressly state that master-meter customers are limited to the submeter discount as the only means to recoup utility expenses. Along the same lines, Hillsboro contends that, because the trenching and conduit costs and electric pedestal costs are not reimbursed through the submeter discount, Hillsboro properly included them in its rent increase petitions. While Hillsboro is not entitled to retain the full amount of the rent increases, petitioners are correct that park owners may not be limited solely to the submeter discount to recover certain utility costs.

Hillsboro bases its argument on *Rates, Charges and Practices*, quoting the portion of the decision in which the PUC stated, "mobile home parks may be permitted to recover costs that are not in any way reimbursed, fully or partially, in the discount . . . ." Hillsboro quotes selectively; the partial sentence continues: ". . . but such recovery should not result in treating the submetered customers differently from the directly metered customers." (*Rates, Charges and Practices, supra*, 61 Cal.P.U.C.2d at p. 231.)

In *Rates, Charges and Practices*, the PUC determined that "[s]tatutorily, the discount covers reasonable costs of owning, operating and maintaining

the submetered system, including 'a factor for investment-related expenses for all initial and ongoing capital upgrade costs,' and 'depreciation of the average installed cost of the equivalent distribution system which the utility has installed in its directly metered parks, return on investment, income taxes on the return, and property (ad valorem) taxes.'" (*Rates, Charges and Practices, supra,* 61 Cal.P.U.C.2d at p. 231, quoting Dec. No. 92-02-090, 58 Cal.P.U.C.2d at p. 717.) However, the decision did not specify whether charges related to trenching and conduit for common area lighting and for replacing pedestals were considered in setting the discount.

If trenching and conduit for overhead lighting or electric pedestals are statutorily required to be included in the discount, then park owners are barred from recovering such costs in the form of rent charges. (See *Rates, Charges and Practices, supra,* 61 Cal.P.U.C.2d at p. 231.) "However, if such costs are not statutorily required to be considered in the discount, and directly metered tenants pay for such costs in rents, then submetered tenants should be charged accordingly. The key is that submetered customers are to be treated the same as directly metered customers." (*Ibid.*)

The PUC, apparently acknowledging some ambiguity in the status of these categories of costs, concluded in *Rates, Charges and Practices* that "[a]s to which costs are covered by the statute, the mobile home park owners should raise these particular costs in the next GRCs [general rate case proceedings], so that all parties have an opportunity to litigate the matter in hearings. The record in the instant case is not sufficient to resolve this issue." (*Rates, Charges and Practices, supra,* 61 Cal.P.U.C.2d at p. 231.)[9] Similarly, the Decision at issue here notes that the record is "substantively inadequate" to adjust the submeter discount, and "underscores the importance of a broader, generic review." (Decision, at p. 20.)

By participating in subsequent rate case proceedings of PG&E, petitioners would be able to put on testimony and evidence relevant to the submeter discount, including whether certain expenses are required to be considered in the submeter discount. (See *Steiner, supra,* 76 Cal.P.U.C.2d at p. 532.) If the PUC then concluded that certain expenses not heretofore included in the discount must be included, an adjustment to the amount of the discount might be appropriate. (See *id.* at p. 533 ["As any other member of the public, [the park owner] has the opportunity to participate in the rate cases and

---

[9]In *Rates, Charges and Practices,* WMA raised common area electrical costs as a specific example of a cost associated with the submeter system that is not considered in calculating the discount. (*Rates, Charges and Practices, supra,* 61 Cal.P.U.C.2d at p. 231.) The PUC noted that example in its discussion of the issue and conclusion that such costs should be raised in the next GRC's. (*Ibid.*)

present evidence on the appropriate credit required for maintaining the submetered system."].) If the PUC concluded that such expenses are not required to be included in the discount, then the inquiry would be whether directly metered tenants pay for such costs in rent. (See *Rates, Charges and Practices, supra,* 61 Cal.P.U.C.2d at p. 231.) If so, it follows that submetered tenants should be charged accordingly. (*Ibid.*)

Hillsboro is attempting to claim in this proceeding *instead of in a rate case* that it is entitled to increased rents based on capital improvements, such as trenching for laying conduit and electric pedestal replacement, that PG&E does not provide to its direct customers. Hillsboro subpoenaed John S. Harnett, Jr., a senior rates analyst with PG&E, who testified that PG&E does not include common area costs and electric pedestal costs in calculating the master-meter discount.

While Hillsboro may be correct that the discount as presently calculated does not include trenching and conduit for overhead street lighting and electric pedestal replacement, the argument is beside the point. This dispute between mobilehome park tenants and the park owner is not the appropriate proceeding to clarify or adjust PG&E's rates. The issue of whether certain costs are statutorily required to be included in the discount resides exclusively with the PUC. By failing to obtain the PUC's authorization or confirmation that common area or pedestal costs may properly be passed through to tenants, Hillsboro has incurred expenses "at its peril, having determined to ignore D.95-08-056 (*Rates, Charges and Practices*)."[10] (Decision, at pp. 18-21.)

WMA was a party to the proceedings in *Rates, Charges and Practices,* and thus has been aware since 1995 of the PUC's directive that the issue be litigated in general rate case proceedings. WMA contends that park owners have had no opportunity to raise submeter discount issues in PG&E's GRC's. In rejecting this contention below, the PUC observed that the rate design portion (phase II) of PG&E's 1996 test year proceeding did in fact go forward and that WMA participated in that proceeding. (Decision, at p. 18, citing [*Application of*] *Pacific Gas and Electric Company* (1997) 77 Cal.P.U.C.2d 171 [Dec. No. 97-12-044].) Decision No. 97-12-044 indicates that WMA worked with PG&E to update studies relating to the natural gas submeter discount and points out that no party to the proceeding proposed changes to the electricity discount. (77 Cal.P.U.C.2d at pp. 189-190, 210, [finding of fact 20].) Moreover, the draft decision was issued for comment twice, but WMA was not among the parties who submitted comments. (*Id.* at

---

[10]Thus, we need not consider Hillsboro's argument that no substantial evidence supports the PUC's order disallowing the pass-through of these costs to tenants.

p. 209.)[11] Although PG&E's 1999 test year GRC was suspended, it appears that petitioners have had opportunity to raise submeter discount issues in general rate case proceedings.[12] (77 Cal.P.U.C.2d at pp. 189-190, 209-210.)

Moreover, it is within the PUC's discretion to require that the issue be addressed in broader proceedings rather than on a case-by-case basis. Petitioners' preferred method of addressing the issue, in which individual park owners would present their expenses and argument to the local rent board for it to decide whether the costs can be passed through to the tenants, would result in the PUC's loss of control over utility rates paid by tenants. This would directly contravene the purpose of section 739.5. Only by controlling the determinations whether certain costs are required to be included in the calculation of the submeter discount and whether utility costs can be passed through to submetered tenants can the PUC fulfill its mandate under the statute.

## IV. Disposition

The PUC's decision is affirmed.

Kline, P. J., and Haerle, J., concurred.

---

[11]At oral argument, WMA asserted that it was not obligated to raise submeter discount issues in PG&E's 1996 GRC because that proceeding did not constitute a *subsequent* GRC under *Rates, Charges and Practices*, which directed mobilehome park owners to raise the issue of costs not otherwise reimbursed in the discount "in the *next* GRCs." (*Rates, Charges and Practices, supra*, 61 Cal. P.U.C.2d at p. 231, italics added.) According to WMA, the 1996 GRC was not the "next" GRC because PG&E's 1996 GRC application in December 1994 predated the August 1995 decision in *Rates, Charges and Practices*. In the absence of any evidence that WMA was prevented from raising submeter discount issues during the 1996 GRC proceedings, we reject the contention.

[12]In addition, further opportunity currently exists. First the PUC has advised the court that the rate design phase of PG&E's current general rate case is scheduled for early 2003. Second, subsequent to oral argument in this matter, the court was advised that the PUC had issued an order instituting investigation (OII) and an order instituting rulemaking (OIR) to examine issues involved in the master-meter discount for submetered mobilehome parks and to stay Decision No. 01-08-040 pending resolution of the OII/OIR. (OIR No. 03-03-017, OII No. 03-03-018 (Mar. 17, 2003) at pp. 1, 10.) The PUC has named all gas and electricity companies serving master-metered parks as respondents, which will enable the PUC to address master-meter discount issues on a statewide level. (*Id.* at pp. 6-7, 9.)