[No. D042963. Fourth Dist., Div. One. July 12, 2004.]

UTILITY CONSUMERS' ACTION NETWORK, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
SAN DIEGO GAS & ELECTRIC COMPANY, Real Party in Interest.

COUNSEL

Rosner, Law & Mansfield and Alan M. Mansfield for Petitioner.

Laurence G. Chaset, Randolph L. Wu, Mary F. McKenzie and Amy C. Yip-Kikugawa for Respondent.

Orrick, Herrington & Sutcliffe, Joseph M. Malkin, William W. Oxley, Howard M. Ullman, T. Jason White; David B. Follett and Jeffrey M. Parrott for Real Party in Interest.

OPINION

**McINTYRE, J.**—In this petition for writ of review, Utility Consumers' Action Network (UCAN) challenges the Public Utilities Commission's (PUC) acceptance of an offer by San Diego Gas & Electric Company (SDG&E) to settle a pending federal lawsuit against the PUC involving hundreds of millions of dollars.

UCAN contends the PUC misconstrued Public Utilities Code section 332.1 (all subsequent statutory references are to the Public Utilities Code), which (1) imposed a 6.5 cents per kilowatt-hour rate ceiling for electricity customers of SDG&E as part of an effort to stabilize electricity rates during California's energy crisis, and (2) directed the PUC to set up an accounting mechanism for SDG&E to recover its reasonable costs stemming from the rate ceiling by applying SDG&E profits from its generation assets. UCAN argues that in approving SDG&E's settlement proposal, the PUC exceeded its authority by contravening section 332.1, subdivision (c) and violating two provisions of the California Constitution. Additionally, UCAN maintains the PUC failed to make the necessary factual findings.

The PUC asserts it acted within its powers, correctly interpreted section 332.1, subdivision (c), and did not violate the state Constitution. The PUC disputes that it failed to make necessary factual findings. SDG&E also claims the PUC correctly construed the statute and notes the PUC has broad authority to settle lawsuits against it.

We granted UCAN's petition for writ of review in order to give the matter plenary consideration. The parties have orally argued the matter before us. Having considered the petition on its merits, we conclude the PUC properly accepted SDG&E's settlement offer and did not act contrary to section 332.1

or violate the state Constitution. Accordingly, we affirm the PUC's December 19, 2002 decision No. 02–12–064 (hereafter No. 02–12–064) and its August 21, 2003 decision No. 03–08–072 modification order thereto (hereafter No. 03–08–072) (sometimes collectively referred to herein as decision No. 02–12–064).

## FACTS

### *Background*

SDG&E is an investor-owned public utility providing electrical services in part of Southern California. The PUC is the administrative agency responsible for regulating California's public utilities. (Cal. Const., art. XII, §§ 1–6; Pub. Util. Code, § 701; all statutory references are to the Public Utilities Code unless otherwise specified.) UCAN is a nonprofit consumer advocacy organization that represents the interests of residential and small commercial customers before the PUC and the California Legislature.

In 1996, the Legislature restructured and deregulated California's electric industry in an attempt to make the marketplace more competitive and allow customers to achieve the economic benefits of increased competition. (§ 330 et seq.; see also Stats. 1996, ch. 854, § 1.) In late 1996 and early 1997, SDG&E entered into intermediate term contracts (IT contracts) with Illinova Electric Power Marketing (Illinova), Louisville Gas & Electric Power Marketing, Inc. (LG&E), and Pacificorp to purchase power. The Illinova contract provided for the sale of power from 1997 through 1999; the LG&E and Pacificorp contracts provided for the sale of power from 1998 through 2001. According to SDG&E, it entered into the IT contracts to hedge its shareholders' risk against potential losses caused by deregulation and not to provide power to its customers, except for the 1997 portion of the Illinova contract. The IT contracts proved to be very lucrative. From April 1, 1998 through May 31, 2000, SDG&E obtained profits of $67 million from the contracts. From June 1, 2000 to January 31, 2001, the profits were $130 million. From February 1, 2001 through December 31, 2001, SDG&E accrued $175 million in profits from the IT contracts.

From mid-2000 to early 2001, soaring prices on the wholesale electricity market led to an energy crisis in the state. The Legislature responded by approving, among other urgency measures, Assembly Bill No. 265 (Bill No. 265), which contained section 332.1. (Stats. 2000, ch. 328, § 2.) Section 332.1 established a 6.5 cents per kilowatt-hour rate ceiling for SDG&E's residential, small commercial, and street lighting customers through December 31, 2002, retroactive to June 1, 2000. (§ 332.1, subd. (b).) The statute also

directed the PUC to establish an accounting procedure that would allow SDG&E to recover the amount of its shortfall, if any, between the ceiling and its actual electricity costs and would use "revenues associated with sales of energy from utility-owned or managed generation assets" for that purpose. (*Id.*, subd. (c).)

Bill No. 265 was signed into law on September 6, 2000, as an urgency measure. The PUC immediately established a 6.5 cents per kilowatt-hour rate ceiling for SDG&E residential, small commercial, and street lighting customers.

In January 2001, the energy crisis worsened as rolling blackouts were imposed throughout the state, and the Governor declared a state of emergency. In response, the PUC issued an emergency interim order. In its decision No. 01–01–061, filed January 31, 2001 (hereafter No. 01–01–061), the PUC ordered SDG&E and the state's two other major utilities to use all electricity resources under their control or "utility-retained generation" (URG) to first serve existing customers at cost-based rates. SDG&E filed a petition for rehearing urging that the IT contracts were a shareholder asset, and if it were required to supply the energy it acquired under those contracts at cost-based rates, the PUC directive would constitute an unconstitutional taking without just compensation. On May 3, 2001, in its decision No. 01–05–035 (hereafter No. 01–05–035), the PUC denied SDG&E's rehearing petition.

On June 5, 2001, SDG&E filed a petition for review with this court, challenging the PUC decision Nos. 01–01–061 and 01–05–035 with respect to the IT contracts. (*San Diego Gas & Electric Company v. California Public Utilities Commission* (D038064, stay issued May 29, 2002, pending further order of the court).) SDG&E's petition sought a peremptory writ of mandate directing the PUC to correct the PUC decision Nos. 01–01–061 and 01–05–035 to specify that the IT contracts belong to SDG&E's shareholders and may not be taken to serve SDG&E's retail customers at cost. In a federal lawsuit it filed on February 25, 2002, SDG&E sought declaratory and injunctive relief against the PUC decision Nos. 01–01–061 and 01–05–035, claiming that if allowed to stand as issued, it would amount to an unconstitutional taking without just compensation. (*San Diego Gas & Electric Company v. Lynch* (S.D.Cal., Feb. 25, 2002, No. 02–CV–339–BTM).)

*The Instant Petition*

Following the September 2000 implementation of the 6.5 cents per kilowatt-hour rate ceiling under section 332.1, subdivision (b), SDG&E filed two applications with the PUC related to Bill No. 265. SDG&E sought, among other things, to convert the 6.5 cents per kilowatt-hour rate ceiling to a frozen rate. (Cal. P.U.C., App. No. 00–10–045 (Oct. 24, 2000).) SDG&E also requested authority to assess a surcharge of 2.3 cents per kilowatt-hour, subsequently revised to 0.349 cent per kilowatt-hour, to amortize the Bill No. 265 shortfall. (Cal. P.U.C., App. No. 01–01–044 (Jan. 24, 2001).) The two applications were consolidated on February 16, 2001. Consideration of the consolidated applications was suspended from July 7, 2001, until March 28, 2002, while the PUC considered portions of a memo of understanding between the Department of Water Resources, SDG&E, and SDG&E's parent company Sempra Energy that would have made most of the issues raised in the applications moot. The PUC ultimately rejected the portions of the memo of understanding pertinent to SDG&E's applications, and evidentiary hearings on the applications were scheduled to begin on June 24, 2002.

On June 14, 2002, SDG&E sent a proposal to the PUC to settle its federal litigation concerning the treatment of the IT contracts in decision Nos. 01–01–061 and 01–05–035. Under the proposed settlement, SDG&E would write off—not collect from its customers—$24 million of the current Bill No. 265 shortfall. Additionally $175 million in IT contract profits that SDG&E had already allocated to the benefit of ratepayers pursuant to decision No. 01–01–061 would remain with ratepayers. Under the proposed settlement, SDG&E would retain as its property $173 million in IT contract profits that SDG&E accrued prior to decision No. 01–01–061 for the sole account of its shareholders. (The PUC maintains that under the settlement, ratepayers and SDG&E shareholders each will receive roughly half of the IT contract profits.) SDG&E also proposed to dismiss its writ proceeding in this court following approval of the settlement by the federal court and successful resolution of all challenges to the settlement agreement.

The scope of these proceedings on SDG&E's applications regarding implementation of Bill No. 265 was expanded to include the proposed settlement even though the settlement only involved litigation out treatment of the IT contracts in PUC decision Nos. 01–01–061 and 01–05–035. Comments on the proposed settlement were solicited, and UCAN, among others, filed comments. The PUC also conducted hearings in San Diego and Carlsbad to afford the public an opportunity to comment on the proposed settlement.

Throughout these proceedings, SDG&E has maintained the IT contracts were shareholder assets and were not intended to fall within the "utility-owned or managed generation assets" language of section 332.1, subdivision (c).

SDG&E presented evidence that it had forecast its shareholders' exposure from deregulation at approximately $1.7 billion and sought to hedge or minimize this exposure by negotiating attractively priced power-purchase contracts. In October 1996, SDG&E directors endorsed the strategy of acquiring power-purchase contracts to hedge the shareholders' price risk and approved the Illinova contract. Only the power purchased through the first year of the Illinova contract was to supply SDG&E's customers; the remainder of the Illinova power was to hedge against energy market price fluctuations. (In addition to using the power purchased from Illinova in 1997, SDG&E used the power it obtained from Illinova during the first three months of 1998 to serve its customers because the statewide California Power Exchange did not begin operations until April 1, 1998.) In November 1996, SDG&E directors approved the LG&E and Pacificorp contracts solely to hedge the shareholders' price risk. SDG&E also presented evidence that it treated the IT contracts as shareholder assets in its accounting practices.

However, UCAN, and other parties aligned with it, noted that the IT contracts were used to supply energy to SDG&E customers in 1997 and the first three months of 1998. They also noted that SDG&E did not request a PUC determination pursuant to section 851 that the contracts were no longer used and useful in the performance of the utility's duties to the public. UCAN and the parties aligned with it further observed that the PUC's 1995 policy decision for restructuring the electric industry declared that utility property, including generation assets, "that has received revenue recovery through rates, is presumed to be used and useful in the performance of the utility's duties to the public" until such time as the PUC determines otherwise. (*Re Proposed Policies Governing Restructuring California's Electric Services Industry and Reforming Regulation* (1995) 64 Cal. P.U.C.2d 1, 49–50.) Moreover, SDG&E's corporate parent Sempra Energy, in correspondence to a legislator, implied the PUC had prohibited SDG&E from engaging in hedging transactions, and SDG&E's hedging strategy was not disclosed to the PUC.

On March 31, 2002, the Bill No. 265 shortfall was $338 million. On May 31, 2002, the shortfall was $324.7 million. SDG&E forecast the Bill No. 265 shortfall would be approximately $222 million on December 31, 2002.

On September 24, 2002, the administrative law judge found that the offset provision of section 332.1, subdivision (c) applied to the net revenues (profits) associated with the sales of energy from SDG&E's IT contracts for

the period from June 1, 2000 through January 31, 2001. The administrative law judge said the phrase "utility-owned or managed generation asset" does not make a distinction between a generation asset that serves shareholder interests, such as a hedging instrument, and a generation asset that is used by the utility for the benefit of utility customers. Accordingly, in his proposed decision, the administrative law judge recommended that SDG&E be ordered to apply $130 million plus interest in net revenues from the IT contracts from June 1, 2000 through January 31, 2001, to offset the Bill No. 265 shortfall. That was the amount of the net revenues SDG&E retained from the IT contracts during those dates.

On December 19, 2002, in decision No. 02–12–064, the PUC, by a three-to-two vote, rejected the administrative law judge's recommendations. The PUC found it would be in the best interests of ratepayers and SDG&E's financial integrity to adopt SDG&E's proposed settlement of its federal lawsuit and not determine whether the IT contracts were ratepayer or shareholder assets. According to the decision, the $24 million write-off plus revenues from other sources identified during the hearing had the potential to eliminate the Bill No. 265 shortfall by the end of the 2003. Accordingly, the PUC denied SDG&E's request for a surcharge.

UCAN, among others, sought a rehearing, asserting the PUC decision failed to comply with the mandate of Bill No. 265 by not making a determination whether the IT term contracts were "utility-owned and managed" under section 332.1, subdivision (c), and the PUC improperly adopted the proposed settlement.

On August 21, 2003, in decision No. 03-08-072, the PUC modified decision No. 02–121–064, noting that section 332.1, subdivision (c) was intended to apply only to generation assets owned or managed by a utility for public use—that is, ratepayer assets—and Bill No. 265 permitted funds from sources other than "utility-owned or managed generation assets" to be used to offset the Bill No. 265 shortfall. The PUC denied the rehearing petitions of UCAN and other parties.

## DISCUSSION

UCAN contends the settlement agreement cannot stand because in adopting it the PUC exceeded its authority; skirted its duty to follow the law, namely, section 332.1, subdivision (c); violated article III, sections 3 and 3.5 of the California Constitution; and did not issue sufficient factual findings.

■ Our review of a PUC decision is limited to whether: (1) the PUC acted without jurisdiction or exceeded its jurisdiction; (2) the PUC did not act

in the manner required by law; (3) the decision is not supported by the findings; (4) the findings in the decision are not supported by substantial evidence in light of the whole record; (5) the decision was an abuse of discretion; and (6) the decision violated the United States or the California Constitution. (*Hillsboro Properties v. Public Utilities Com.* (2003) 108 Cal.App.4th 246, 254 [133 Cal.Rptr.2d 343].)

### Does PUC Have the Authority to Settle Litigation?

Generally, yes.

■ The PUC is not an ordinary administrative agency, but a constitutional body with far-reaching powers, duties and functions. (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905 [160 Cal.Rptr. 124, 603 P.2d 41]; Cal. Const., art. XII, §§ 1–6.) The Constitution confers broad authority on the PUC to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparations, and establish its own procedures. (Cal. Const., art. XII, §§ 2, 4, 6.) "The commission's authority has been liberally construed." (*Consumers Lobby,* at p. 905.)

■ The Constitution also provides the Legislature may confer additional authority and jurisdiction upon the PUC. (Cal. Const., art. XII, § 5.) Pursuant to this constitutional provision, the Legislature enacted the Public Utilities Act (§ 201 et seq.). Section 701 vests the PUC with broad authority to "supervise and regulate every public utility in the State" and to "do all things . . . which are necessary and convenient" in the exercise of its jurisdiction over public utilities. The PUC has the inherent authority under section 701 to enter into binding contracts. (See *US Ecology, Inc. v. State of California* (2001) 92 Cal.App.4th 113, 132 [111 Cal.Rptr.2d 689] ["Administrative ' " 'officials may exercise such additional powers as are necessary for the due and efficient administration of powers expressly granted by statute, or as *may fairly be implied* from the statute granting the powers.' " ' [Citation.] Thus, an administrative agency has the power to contract on a particular matter if this power may be fairly implied from the general statutory scheme"].)

■ Further, California law does not prohibit state agencies, such as the PUC, from being a party to an agreement that settles existing litigation. (See *Rich Vision Centers, Inc. v. Board of Medical Examiners* (1983) 144 Cal.App.3d 110, 117 [192 Cal.Rptr. 455] ["we discern no reason in logic, law or policy to deny to the Board as a state agency acting on behalf of the state citizenry . . . the same options to settle cases on any legitimate terms as are available to private litigants"].)

■ Our Supreme Court has recently confirmed that the PUC has the inherent authority to enter into a binding agreement that compromises disputes as long as the agreement is not inconsistent with state law. (*Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 792 [3 Cal.Rptr.3d 703, 74 P.3d 795].) "Statutorily, PUC is authorized to supervise and regulate public utilities and to 'do all things . . . which are necessary and convenient in the exercise of such power and jurisdiction' (§ 701); this includes the authority to determine and fix 'just, reasonable [and] sufficient rates' (§ 728) to be charged by the utilities. Adverting to these provisions, we have described PUC as ' "a state agency of constitutional origin with far-reaching duties, function and powers" ' whose ' "power to fix rates [and] estlish rules" ' has been ' "liberally construed." ' [Citations.] If PUC lacked substantive authority to propose and enter into the rate settlement agreement at issue here, it was not for lack of inherent authority, but because this rate agreement was barred by some specific statutory limit on PUC's power to set rates." (31 Cal.4th at p. 792.)

### Was PUC Barred from Adopting This Settlement by the California Constitution?

No.

■ Despite its broad discretion in ratemaking and matters of energy policy, the PUC cannot change state law (see Cal. Const., art III, § 3) and therefore it cannot enter into settlement agreements that would change state law or that would enjoin it from enforcing state law. If the settlement agreement was intended to make any change in state law, then this court must disapprove it.

Throughout these proceedings, SDG&E and UCAN have maintained that the central issue is whether the IT contracts are subject to the balancing account obligations created by Bill No. 265. However, both in its decision and rehearing order, the PUC declined to make this determination, noting instead that the evidence concerning the nature of the IT contracts was conflicting. Rather than apply section 332.1 to resolve the Bill No. 265 shortfall, the PUC found it would be in the best interest of SDG&E and the public to adopt the proposed settlement agreement. In effect, the PUC, by adopting the settlement, sidestepped the issue of whether section 332.1, subdivision (c) required the IT contracts be used to offset the Bill No. 265 shortfall.

The settlement agreement itself did not contravene section 332.1, subdivision (c). The settlement agreement concerned the federal litigation instituted

by SDG&E against the PUC and resolved that dispute. Although the agreement resolved how the revenue from the IT contracts was to be allocated, it did not mention section 332.1, subdivision (c). The only oblique reference to the statute was the provision that SDG&E "will write-off, and not collect from customers, an additional $24 million of the current balance in SDG&E's ERSA [Energy Revenue Shortfall Account]." The ERSA is the account where the Bill No. 265 shortfall is tracked. Nothing in the terms of the settlement agreement interpreted or invoked section 332.1 or enjoined the PUC from enforcing the statute.

We conclude the settlement agreement did not change state law or purport to do so; it was not violative of article III, section 3 of the California Constitution. Further, in adopting the settlement, the PUC did not violate California Constitution, article III, section 3. Contrary to UCAN's arguments, the PUC did not change or modify section 332.1, subdivision (c); the PUC merely offered an interpretation of the statute, which made application unnecessary. As we shall explain, *post*, we disagree in part with the PUC's interpretation of the statute, but our disagreement has no bearing on the legality of the settlement agreement.

UCAN also argues the PUC violated article III, section 3.5 of the California Constitution, which prohibits an administrative agency from refusing to enforce a statute thought to be unconstitutional unless an appellate court has so determined. (*Id.*, subd. (a).) UCAN contends that is what the PUC essentially did by adopting the settlement of SDG&E's federal lawsuit, which claimed that the PUC's earlier treatment of the IT contracts constituted an unconstitutional taking. In UCAN's view, the PUC settled the issue of the constitutionality of section 332.1, subdivision (c)—a task that is beyond its purview. We disagree.

■ Adopting the settlement was not tantamount to a finding by the PUC that section 332.1, subdivision (c) was unenforceable or to a refusal to enforce the statute on the basis that it is unconstitutional. The PUC merely decided not to take the risk of losing a lawsuit in which hundreds of millions of dollars were at stake. Moreover, the constitutionality of section 332.1, subdivision (c) was not an issue in the federal lawsuit. Rather, at issue in the federal lawsuit was the constitutionality of the PUC emergency orders in decision Nos. 01–01–061 and 01–05–035 requiring SDG&E to use its URG, including energy from the IT contracts, to serve customers at cost-based rates. Therefore, we reject UCAN's argument that the PUC's approval of the proposal was somehow equivalent to finding the statute unconstitutional.

*Did PUC Correctly Construe Section 332.1, Subdivision (c)?*

Yes and no.

Bill No. 265 added section 332.1 to the Public Utilities Code. (Stats. 2000, ch. 328, § 2.) Section 332.1, subdivision (c) provides: "The commission shall establish an accounting procedure to track and recover reasonable and prudent costs of providing electric energy to retail customers unrecovered through retail bills due to the application of the ceiling provided for in subdivision (b). The accounting procedure shall utilize revenues associated with sales of energy from utility-owned or managed generation assets to offset an undercollection, if undercollection occurs. The accounting procedure shall be reviewed periodically by the commission, but not less frequently than semiannually. The commission may utilize an existing proceeding to perform the review. The accounting procedure and review shall provide a reasonable opportunity for [SDG&E] to recover its reasonable and prudent costs of service over a reasonable period of time."

In its decision in this proceeding, the PUC made the following conclusions of law with respect to Bill No. 265 and section 332.1, subdivision (c):

"27. The phrase 'utility-owned or managed generation assets' refers to those generation assets owned or managed by the utility for the benefit of ratepayers.

"28. AB 265 permits funds from sources other than 'utility-owned or managed generation assets' to be used to offset the AB 265 undercollection." (No. 02–12–064, as modified by No. 03–08–072.)

As we shall explain, we disagree with the PUC's interpretation of the phrase "utility-owned or managed generation assets" in section 332.1, subdivision (c). However, we agree that the statute does not prohibit the use of other sources to offset the Bill No. 265 shortfall.

In construing any statute, "[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law. [Citation.] We first examine the words themselves because the statutory language is generally the most relile indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context."

(*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726].)

■ Contrary to the PUC's interpretation, the phrase "utility-owned or managed generation assets" does not refer to generation assets owned or managed by the utility for the benefit of ratepayers. Nothing in the language of the statute makes a distinction between a generation asset that serves shareholder interests and a generation asset that is used by the utility for the benefit of its utility customers. As the administrative law judge correctly pointed out, "utility-owned or managed," which modifies "generation assets," are the operative words. Put another way, the statute applies to generation assets that are owned or managed by the utility. Had the Legislature wanted to make a distinction between *shareholder* generation assets and *ratepayer* generation assets, it could have done so. It has not. ■ When the statutory language is clear and there is no uncertainty as to the legislative intent, we look no further and enforce the statute according to its terms. (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743 [110 Cal.Rptr.2d 828, 28 P.3d 876].) Words that are not there should not be read into a statute. (*Security Pacific National Bank v. Woz* (1990) 51 Cal.3d 991, 998 [275 Cal.Rptr. 201, 800 P.2d 557]; Code Civ. Proc., § 1858.) That is what the PUC inappropriately did in finding a distinction between shareholder assets and ratepayer assets.

■ As to whether the utility-owned or managed generation assets must be the exclusive source to offset the Bill No. 265 shortfall, we reach the same conclusion as the PUC. Section 332.1, subdivision (c) requires the PUC to set up an accounting procedure to track and recover the Bill No. 265 shortfall. The procedure must use "revenues associated with sales of energy from utility-owned or managed generation assets to offset an undercollection, if undercollection occurs." (§ 332.1, subd. (c).) The statute does not limit the source of money for this purpose to "revenues associated with sales of energy from utility-owned or managed generation assets." We decline to insert the word "only" into the statute before the words "utilize revenues." Our interpretation allows the shortfall to be offset by other sources in addition to the "revenues associated with sales of energy from utility-owned or managed generation assets." This interpretation is also in keeping with the final sentence of section 332.1, subdivision (c): "The accounting procedure and review shall provide a reasonable opportunity for [SDG&E] to recover its reasonable and prudent costs of service over a reasonable period of time." The words of a statute should be construed in their statutory context. (*Hassan v. Mercy American River Hospital, supra,* 31 Cal.4th at p. 715.)

Since the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its

terms. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Thus, it is unnecessary for us to address UCAN's suggestion that the word "all" is implied in various parts of section 332.1, subdivision (c).

### *Did PUC Contravene Section 332.1, Subdivision (c)?*

No.

Notwithstanding our disagreement with the PUC reading a distinction between shareholder generation assets and ratepayer assets in the statutory language "utility-owned or managed generation assets," we find the PUC adopted a settlement that did not contravene section 332.1, subdivision (c). Under the terms of the settlement, SDG&E agreed that a significant portion of its IT contract profits would be allocated to the benefit of ratepayers and that it would write off an additional $24 million of the balance in the Bill No. 265 shortfall account. Further, the PUC found that other sources are available to offset the Bill No. 265 shortfall, which made SDG&E's proposed surcharge unnecessary. The PUC thus acted in accordance with our reading of section 332.1, subdivision (c), namely, it adopted an accounting mechanism in which the Bill No. 265 shortfall is to be offset with revenue from the IT contracts, but not necessarily on an exclusive basis, and at the same time, SDG&E is provided an opportunity "to recover its reasonable and prudent costs of service over a reasonle period of time." (§ 332.1, subd. (c).)

We realize the PUC avoided the question of whether the IT contracts were subject to section 332.1, subdivision (c). As we indicated above, it neatly sidestepped deciding the issue by adopting the settlement. However, UCAN has not directed us to, and our research has not found, any authority to indicate the PUC acted contrary to law by not directly addressing whether section 332.1, subdivision (c) applied to the IT contracts.

In any event, the fact the PUC circumvented the issue is not determinative. Before us is the PUC's decision No. 02–12–064, and we must determine whether the settlement agreement should stand. In agreeing to settle the federal litigation, the PUC essentially decided not to gamble on how the federal courts would rule on the federal constitutional taking issue. Had the PUC adopted UCAN's interpretation of section 332.1, subdivision (c) or otherwise found the statute applied to the IT contracts, the PUC would still face the risk of an adverse federal ruling on the taking issue.

*Should the Settlement Agreement Be Set Aside?*

No.

We realize that the parties have different views as to the extent of the compromise reflected by the settlement. The PUC and SDG&E maintain that under the settlement the ratepayers get more than half of the IT contract profits. UCAN counters that the settlement deprived ratepayers of more than $130 million in IT contract profits that should be used to offset the Bill No. 265 shortfall under section 332.1, subdivision (c).

In evaluating these contrasting views, we give more weight to the positions of the PUC and SDG&E because we cannot disregard the fact that the settlement under review here directly involved SDG&E's challenge over the PUC's January 2001 emergency orders as well as impacting this proceeding out Bill No. 265. Because the IT contracts were intricately connected to both the proceeding involving the January 2001 emergency orders and this proceeding, we accept the PUC's and SDG&E's assessment that the settlement benefits the ratepayers of approximately $199 million compared to $173 million for the shareholders. To accept UCAN's position that the ratepayers were shortchanged by $106 million ($130 million minus $24 million) would be tantamount to ignoring the interconnection between the two proceedings.

The PUC considered the interests of ratepayers, SDG&E shareholders and the public in general, and decided that the agreement was appropriate as a matter of public utility policy. The settlement agreement resolved SDG&E's federal litigation against the PUC commissioners, in which SDG&E asserted an unconstitutional taking without just compensation of its profits from the IT contracts. SDG&E claimed that had it been able to sell power from the IT contracts on the open market without any regulatory restrictions, it potentially could have accrued a profit of $350 million from February 2001 through December 2001. We do not know how the federal courts would rule on the constitutional taking issue and how much compensation SDG&E would ultimately receive if the courts ruled in its favor. Neither did the PUC. However, the PUC, given the opportunity to avoid the risk, made a judgment that it was in the public interest to accept SDG&E's settlement offer; in other words, it was better for all concerned to compromise the matter rather than chance an adverse ruling in the federal lawsuit. It is not our role to second guess that judgment by the PUC. There has been no showing the risk was so minimal that the PUC's adoption of the settlement agreement was imprudent. Given the risk, we cannot say the PUC acted unreasonably in approving the settlement agreement. Moreover, PUC decisions are presumed valid. (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410 [67 Cal.Rptr. 97, 438 P.2d 801].) Having not been presented with any

showing that the execution and performance of the settlement agreement was unlawful, we decline to set it aside. Clearly each side made a major compromise, and therefore the settlement was reasonable.

### *Was PUC's Failure to Make Findings on the IT Contracts Fatal?*

No.

Section 1705 provides in pertinent part: "[T]he commission shall make and file its order, containing its decision. . . . [T]he decision shall contain, separately stated, findings of fact and conclusions of law by the commission on all issues material to the order or decision." As noted by our Supreme Court, findings are essential to "afford a rational basis for judicial review and assist the reviewing court to ascertain the principles relied upon by the commission and to determine whether it acted arbitrarily, as well as assist parties to know why the case was lost and to prepare for rehearing or review, assist others planning activities involving similar questions, and serve to help the commission avoid careless or arbitrary action." (*Greyhound Lines, Inc. v. Public Utilities Com.* (1967) 65 Cal.2d 811, 813 [56 Cal.Rptr. 484, 423 P.2d 556].)

In decision No. 02–12–064, the PUC set forth 55 findings of fact and 28 conclusions of law. In addition, the decision contains a lengthy discussion of the parties' positions and the relevant background and law. The PUC complied with the requirements of section 1705, allowing us a meaningful opportunity to ascertain the principles and facts the PUC relied upon in making its determination.

■ UCAN faults the PUC for not making a finding whether the IT contracts were "utility-owned or managed generation assets." Decision Nos. 02–12–064 and 03–08–072 observed that the arguments and evidence on this issue were conflicting, and so noted in finding of fact No. 44. The PUC cited the conflict in evidence as one reason it concluded the settlement agreement was in the public interest. As indicated above, the PUC side-stepped determining whether the IT contracts were covered by section 332.1, subdivision (c), and hence did not make a factual finding on the question. We conclude the absence of such a factual finding is not fatal. First, there is no mystery of how the PUC made its determination. Second, the PUC would have faced the same risk of an adverse ruling in the federal lawsuit even if it had determined, as we have, that the IT contracts were "utility-owned or managed generation assets." The lack of a factual finding does not render the settlement agreement unreasonable or inappropriate.

## DISPOSITION

PUC decision No. 02–12–064, as modified by PUC decision No. 03–08–072, is affirmed. Respondent and real party in interest are entitled to their costs.

Benke, Acting P. J., and Huffman, J., concurred.

Petitioner's petition for review by the Supreme Court was denied November 10, 2004.