[No. B180308. Second Dist., Div. Eight. Jan. 17, 2006.]

CARSON GARDENS, L.L.C., Plaintiff and Respondent, v.
THE CITY OF CARSON MOBILEHOME PARK RENTAL REVIEW
BOARD, Defendant and Appellant.

**COUNSEL**

Aleshire & Wynder, William W. Wynder and Anthony R. Taylor for Defendant and Appellant.

Hart, King & Coldren, Robert S. Coldren, C. William Dahlin, Mark D. Alpert and Christine A. Renken for Plaintiff and Respondent.

**OPINION**

**BOLAND, J.—**

## SUMMARY

This case involves a rent control board's decision on reconsideration, based on a trial court's peremptory writ, of a general rent increase application by a mobilehome park owner. The trial court's judgment and writ rejecting the board's initial decision required the board to apply an analysis or methodology that "gives due consideration to" debt service costs (mortgage interest) in calculating a fair return on the owner's investment. The board did not appeal the trial court's judgment. Instead, it conducted a new hearing and received new evidence as required by the writ. However, the methodology it ultimately employed excluded debt service costs in calculating a fair return to the park owner. The park owner moved for an order further enforcing the original

judgment. The trial court granted the motion, finding that the board's decision was not in compliance with the judgment and writ because it employed a methodology that excluded debt service costs. The trial court declared the board's decision null and void, and set the rent increase based on a methodology the board had considered and rejected, concluding there was no evidence in the record of any alternative methodology which would comply with the requirements of the writ.

We reverse the trial court's order. While the rent control board failed to comply with the trial court's judgment and peremptory writ, the trial court exceeded its authority by setting the amount of the rent increase instead of again remanding the matter to the board for the exercise of the discretion legally vested in the board.

## LEGAL, FACTUAL AND PROCEDURAL BACKGROUND

We describe first the City of Carson's mobilehome space rent control ordinance, and then turn to the particulars of this case.

A. *The applicable ordinance.*

■ The City of Carson (City) has a rent control ordinance applicable to mobilehome parks, known as the Mobilehome Space Rent Control Ordinance. (Carson Mun. Code, art. IV, ch. 7.) Under the ordinance, the City's Mobilehome Park Rental Review Board (Board) hears and determines rent adjustment applications. The Board is authorized to grant "such rent increases as it determines to be fair, just and reasonable." (Carson Mun. Code, § 4704, subd. (g).) "A rent increase is fair, just and reasonable if it protects Homeowners from excessive rent increases and allows a fair return on investment to the Park Owner." (*Ibid.*) In making its determinations, the Board is required to consider 11 factors specified in the ordinance and "any Guidelines adopted by the City Council, as well as any other relevant factors," and "no one (1) factor shall be determinative." (*Ibid.*) The factors the Board must consider include changes in the consumer price index (CPI); the rent for comparable mobilehome spaces in the City; and changes in reasonable operating and maintenance expenses.[1] The guidelines the Board is required to consider provide, inter alia, the following.

---

[1] The other factors the Board must consider are the length of time since the last hearing and determination by the Board on a rent increase application; the completion of any capital improvements; changes in property taxes or other taxes related to the mobilehome park; changes in the rent paid for the lease of the land; changes in utility charges; the need for repairs caused by circumstances other than ordinary wear and tear; the amount and quality of services provided to the tenant; and any existing written lease between the owner and the tenant. (Carson Mun. Code, § 4704, subd. (g).)

—"The Ordinance does not mandate the use of any formula or guarantee increases equal to the increase in the CPI, or any percentage of the CPI."

—"Debt service incurred . . . to purchase a park may be an allowable operating expense if the purchase price paid was reasonable in light of the rents allowed under the Ordinance and involved prudent and customary financing practices."

—"In evaluating a rent increase application, the Board may consider, in addition to the factors specified in § 4704(g) of the Ordinance, a 'gross profits maintenance analysis,' which compares the gross profit level expected from the last rent increase granted to the park prior to the current application ('target profit') to the gross profit shown by the current application. This analysis will be included in the staff report to the Board in addition to analysis concerning the eleven factors . . . ."

—The gross profits maintenance analysis "is intended to provide an estimate of whether a park is earning the profit estimated to provide a fair return, as established by the immediately prior rent increase, with some adjustment to reflect any increase in the CPI. The analysis is an aid to assist the Board in applying the factors in the Ordinance and is to be considered together with the factors in § 4704(g), other relevant evidence presented and the purposes of the Ordinance. The analysis is not intended to create any entitlement to any particular rent increase."[2]

B. *The Carson Gardens rent increase application: Round One.*

Carson Gardens, L.L.C., purchased a mobilehome park in the City in October 1997.[3] On October 11, 2000, three years after acquiring the park, Carson Gardens filed a written application for a rent increase in the amount of $105.50 per space per month.[4] This application was the first rent increase application filed since 1993. Carson Gardens based its proposed rent increase on "gross profits maintenance analysis," a method utilized by the

---

[2] The revised "Guidelines for Implementation of the Mobilehome Space Rent Control Ordinance" were adopted by resolution (No. 98-010), approved by the city council and the mayor in January and February 1998. Section 1 of the resolution states that the city council found it necessary to revise the guidelines for several reasons, one of which was "to incorporate the Gross Profits Maintenance Analysis that has been utilized by the Board for many years to assist in analyzing rent increase applications."

[3] Carson Gardens purchased the park on October 10, 1997, for $1,550,000 through a line of credit. The property was appraised on December 4, 1997, for the same amount, in connection with Carson Gardens' application for permanent financing.

[4] All of the dollar amounts for rent used in this opinion refer to the rental amount per space, per month.

Board for many years in analyzing rent increase applications. This methodology compares the gross profit level expected from the last rent increase granted to the park (here, in June 1993) to the gross profit shown in the current application.[5] In this case, principally because the prior owner had no debt service costs, the gross profit for the park was much higher in 1992 than in 1999 (the last full year of financial information available for the comparison). The difference between the amount required to maintain gross profits at the 1992 level (with CPI adjustments) and the actual gross profit in 1999, divided by the number of spaces in the park, resulted in the requested rent increase of $105.50. Had the rent increase application been granted, rent levels would have increased to a range of $309.80 to $343.66 per space, an increase of 44.30 percent to 51.64 percent for each rental space.

### 1. *The Board's resolution.*

The Board, in a resolution adopted August 22, 2001, granted a rent increase of 9.68 percent, ranging from $19.78 to $23.05 per space. The Board found this increase, which equaled 50 percent of the increase in the CPI since the 1993 rent increase (or 84.5 percent of the increase in the CPI since Carson Gardens purchased the park in 1997), would be fair, just and reasonable. The Board stated: "[T]he comparison provided by [the gross profits maintenance analysis] would not be meaningful because the estimated gross profit target for the Park set by the 1993 rent increase was based on the absence of debt service and much lower property taxes. [Carson Gardens] who purchased the Park with notice of the rents allowed by the Ordinance at the time of purchase and the limitations on rent increases provided by the Ordinance and who incurred such a large amount of debt could not reasonably expect to earn the same profit as the prior owner. Therefore, it is more appropriate to increase rents by a percentage of the increase in the CPI since the last rent increase granted for the Park. Further, because a substantial portion of the large increase in the CPI since the former owner last obtained a rent increase is due to the increase in the CPI before [Carson Gardens] purchased the Park, it would be reasonable to consider only the increase in the CPI since [Carson Gardens] purchased the Park. Further, in these circumstances and considering the rents charged by the comparable parks it would . . . not be fair to base an increase in existing rents on 100% or 75% of the increase in the CPI since the last hearing on the park rent application."[6]

---

[5] Gross income less operating expenses equals gross profit.

[6] The Board also found the increase it approved would increase the rents in the park to the second highest among comparable parks "even though the Park does not contain a recreation building and is not as well maintained as some of the comparison parks."

## 2. *Trial court proceedings.*

Carson Gardens petitioned for administrative mandamus, and later moved for a writ of mandate. On April 16, 2003, the trial court issued a peremptory writ directing the Board to set aside its resolution and to conduct a new hearing. The Board was specifically ordered to:

—reconsider its decision on the Carson Gardens rent increase application "in light of all relevant evidence offered at the new hearing, including new evidence, if any, not offered at [its] prior hearing . . ."; and

—"[t]o apply the gross profits maintenance analysis discussed in the Guidelines . . . or another reasonable analysis or methodology that gives due consideration to the Park's actual reasonable operating expenses, including actual reasonable expenses incurred in acquiring the Park, and comports with the requirements of the pre-existing Ordinance and the Guidelines . . . ."

A final judgment was entered the same day in favor of Carson Gardens, ordering issuance of a peremptory writ of mandate remanding the action for further administrative proceedings as set forth in the writ. The Board did not appeal the judgment.

## C. *The Carson Gardens rent increase application: Round Two.*

Consonant with the trial court's judgment and writ, the Board conducted a new hearing at which it received further evidence. However, contrary to the trial court's writ, the Board did not apply the gross profits maintenance analysis, and it did not apply another methodology "that gives due consideration to . . . actual reasonable expenses incurred in acquiring the Park . . . ." Instead, the Board engaged the services of Dr. Kenneth K. Baar, an expert on "fair return" cases, who utilizes the "maintenance of net operating income" (MNOI) methodology for calculating a fair return on investment to a landlord. The MNOI methodology for determining a fair return on investment, found in other cases to be a fairly constructed formula (*Rainbow Disposal Co. v. Escondido Mobilehome Rent Review Bd.* (1998) 64 Cal.App.4th 1159, 1172 [75 Cal.Rptr.2d 746]), excludes consideration of mortgage interest as an operating expense. Under the MNOI methodology, the park owner is entitled to pass through operating cost increases (exclusive of mortgage interest) between the base year and the current year, and to obtain an increase in net operating income based on the percentage increase in the CPI. The resulting net operating income is available for the payment of debt service and to provide cash return on investment.

1. *The Board's resolution.*

The Board concluded a rent increase of $36.44 would be fair, just and reasonable. The Board found, inter alia:

—The CPI had increased 19.35 percent since the last rent increase. A 19.35 percent increase in the base rent would result in an average increase of $41.58 per space, per month.

—The rents at Carson Gardens were $47.45 below one of the comparable mobilehome parks, and $11.73 below the other comparable park, or $29.59 below the average for the two parks.

—As for changes in reasonable operating and maintenance expenses, the Board calculated operating cost increases without taking into account the increase in the park owner's debt service. The Board found: "The prior owner of the park did not have any mortgage obligation. . . . In 1999, the interest payments on the owners mortgage were . . . $76.71 per month per mobilehome space. The Board finds that it would be more consistent with the intent of this ordinance and prevailing judicial fair return doctrine to provide for an increase in net operating income which reflects the inflation which occurred during this period."

—Under a gross profits maintenance analysis, Carson Gardens would be entitled to a rent increase of $113.37.[7] The Board pointed out, however, that under the guidelines a gross profits maintenance analysis "may" be considered, but is "not intended to create any entitlement to any particular rent increase," and under the guidelines debt service to purchase a park "may" be an allowable operating expense.

—A pass-through based on the amount of the mortgage interest cost increase would not be reasonable. Allowing a dollar-for-dollar pass-through of the debt service increase would result in an overall rent increase of 49 percent, "far above the 19.35% increase between the CPI between the base year and the current year. Such an increase would create a 'windfall' for the current park owner based on the fact that the prior park owner did not have a mortgage."[8]

---

[7] The components of this increase would be a pass-through of cost increases since the prior rent increase ($16.64), an increase in net income ($20.02), and pass-through of the increase in debt service ($76.71).

[8] The Board observed that under Baar's MNOI analysis, Carson Gardens' adjusted net operating income was $170,470.46, which was available for the payment of its annual debt service costs ($88,638.96) and to provide cash return on its investment.

—A rent increase of $36.44 would be fair, just, reasonable and consistent with the intent of the Carson ordinance, considering that:

—The relevant increase in the CPI would justify an increase of $41.58;

—An increase of $29.59 would raise the rent to the level of comparable parks; and

—An increase of $36.44 under the MNOI standard would meet constitutional fair return standards.

### 2. *Trial court proceedings.*

Carson Gardens sought further enforcement of the trial court's April 16, 2003 judgment. Specifically, Carson Gardens requested an order directing the Board to grant a rent increase of $113.37; requiring the Board to grant an additional increase to compensate it for income lost based on the wrongful denial of a rent increase as of August 2001; and imposing a civil fine of $1,000 "upon each of the Respondents who knowingly and willfully disregarded the judgment and writ . . . ."

The trial court declared the Board's resolution authorizing a $36.44 rent increase null and void, and granted Carson Gardens a rent increase of $113.36 retroactive to August 1, 2001. The trial court stated, inter alia:

—The court issued the April 16, 2003 writ based on its conclusion that "the . . . Board had historically acted to account for and was required by its own process to utilize a methodology for reviewing discretionary rent increase applications which gives due consideration to the Park's actual reasonable operating expenses, including any financing costs associated with ownership and acquisition of a park."

—The Board's resolution was "not in compliance with the April 16, 2003 Judgment or Writ . . . in that it fails to consider all of the Park's actual reasonable operating expenses and, in particular, . . . adopted, for the first time, a Maintenance of Net Operating Income methodology because that methodology would allow [the Board] to exclude financing costs as an operating expense."

—No evidence was presented by the Board of an alternative methodology which would comply with the requirements of the writ.

—"[I]t is plain from the record that the methodology utilized to adopt Resolution 200[4]-227 was chosen for the purpose of deleting certain costs from the process."

—The Board was required to either adopt the gross profits maintenance methodology "or such other methodology as would actually comply with the Judgment and Writ."

—Based on the Board's own calculations, the proper application of the gross profits maintenance methodology "mandates a rent increase of $113.36 per space, per month."

—At the hearing, the court repeatedly expressed reservations about the size of the $113 increase. Thus:

"You know, I would have hoped that the City could have come up with or could have applied the G.P.M. method in a way where they maybe don't have to allow the whole $113.00. That is a huge increase, and that may or may not be necessary for the fair return on investment. But I really can't tell at this point because the City did not use that approach at all. Maybe allowing fifty percent of that would amount to a fair return. But I can't tell because the City did not use that method."

"I just would have liked to have seen this thing resolved in some kind of reasonable way without the one-hundred-thirteen-dollar increase unless it is shown that that is, indeed, a fair return, and I have really no way of telling here on this record something in-betweenish. But what I have does not comply with what the court ordered."

"I do have a problem with the $113.00 plus everything else that you want, given that there's really—I can't tell that that's needed for a fair return."

"[I]f the Board had used that method [gross profits maintenance] and would have come to some conclusion that not all of it would be passed because it is too excessive and fifty percent would be fair to add, that's one thing. But that's not what was done here. I'm not going to send it back a second time. I think it is time we need an appellate ruling here."[9]

The trial court's order granting a $113.36 increase, styled "Judgment on Motion for Supplemental Writ," was entered December 14, 2004, and the Board filed this appeal.

---

[9] The trial court also observed: "In this case, my problem is that the [MNOI] does not comply with my order"; "I do think that this ought to be getting to the court of appeals"; and "[i]t just seems to me that this needs some appellate review in terms of what the City can do when it has an ordinance that stresses G.P.M. and doesn't even mention M.N.O.I and also in terms of the compliance with the court's ruling."

On May 5, 2005, this court denied a motion by Carson Gardens to dismiss the appeal, ruling that the order of December 14, 2004, was appealable, but that the Board had waived any right to raise any issues arising out of the April 16, 2003 judgment.

## DISCUSSION

If we were writing on the proverbial clean slate, our analysis of the propriety of the trial court's order would first require an assessment of a fundamental, controlling issue: the meaning of the Carson ordinance, including whether Carson Gardens was entitled to rely on the Board's use of gross profits maintenance methodology in determining a fair return. If the trial court correctly determined that the Carson ordinance required, or created a reasonable expectation of, the use of gross profits maintenance methodology, then this court would affirm the trial court's order, because the Board did not do so, and did not comply with the trial court's order to do so. On the other hand, if the ordinance does not require use of that methodology, and does not require the Board to include debt service costs in operating expenses, then the Board was free to use some other method of determining the amount of a rent increase that would provide a fair return. (See *Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 191 [197 Cal.Rptr. 284] [rent control agencies are not obliged by the state or federal Constitution to fix rents by application of any particular method or formula].)

We are not, however, writing on a clean slate. As our own order denying Carson Gardens' motion to dismiss this appeal states, by failing to appeal the April 16, 2003 judgment, the Board "waived any right to raise [any] issues" arising out of the judgment. It is perfectly plain—from the hearing transcript, although not from the text of the peremptory writ itself—that the meaning of the Carson ordinance was in fact an issue central to the trial court's judgment, and the Board could have raised the issue by appealing from the judgment. The Board having failed to do so, we cannot now review that issue. The Board was thus bound to comply with the trial court's writ, which required it to use gross profits maintenance analysis or some other methodology giving due consideration to debt service costs in calculating a fair return.

The Board contends that it fully complied with the original writ, and that its selection of MNOI methodology was authorized by the City's ordinance and guidelines as well as Court of Appeal precedents. It is plain, however,

that the Board did not in fact comply with the writ, because it did not use a methodology that considered debt service costs. Indeed, the record supports the trial court's finding that the Board chose the MNOI methodology "for the purpose of deleting certain costs from the process." Moreover, because the Board failed to appeal the trial court's judgment, which was based on the conclusion that the ordinance required use of a methodology that considers debt service costs, the Board's claim that its selection of MNOI methodology was proper under the ordinance is not before us for review.

The Board next contends that, even if its rent increase determination was wrong, the trial court exceeded its authority when it ordered a specific rent increase, and should have remanded the matter to the Board for further consideration. Carson Gardens, on the other hand, contends that remand was not required because "there was no discretion for the Rent Board to exercise," as "[n]o evidence in the record supports any other alternative that is consistent with the 2003 Judgment and Writ." On this point, we agree with the Board that remand was required.

First, the trial court's order sets a rent increase in an amount the Board expressly found would create a "windfall" for Carson Gardens. Moreover, the court itself expressly recognized that, if the Board had used gross profits maintenance analysis "and would have come to some conclusion that not all of it would be passed because it is too excessive and fifty percent would be fair to add, that's one thing." The court, however, could not tell whether allowing 50 percent would amount to a fair return, "because the City did not use that method." Under these circumstances, we think the court was obliged to remand the case once again, so that the Board can exercise its discretion on the question of whether passing through the entire amount of debt service costs was necessary to provide a fair return. Code of Civil Procedure section 1094.5, subdivision (f), provides that when a judgment sets aside an agency decision, the judgment "shall not limit or control in any way the discretion legally vested in" the agency. The court's order setting aside the Board's rent decision and setting the rent at $113.36 obviously eliminates any further exercise of discretion that is legally vested in the Board.

Second, while the court's reluctance to "send it back a second time" is understandable in view of the fact that the Board failed to comply with the trial court's writ the first time, other methods were available to remedy the Board's noncompliance with the writ. (See *Carroll v. Civil Service Commission* (1970) 11 Cal.App.3d 727, 733 [90 Cal.Rptr. 128] [the remedy in cases of refusal or neglect to obey a peremptory writ of mandate "is that

provided for in Code of Civil Procedure section 1097, and is in the nature of sanctions for contempt"].) In *Carroll*, the Court of Appeal reversed the trial court's second order, which directed that a terminated employee be restored to his position with full back pay and privileges, after the commission failed to obey the court's first order, which directed the commission to restore the employee to his job and impose a penalty less severe than dismissal. The commission did not appeal the first order, and thereafter "rejected the [trial] court's order outright" by again finding that discharge was the proper penalty. (*Id.* at p. 732.) The trial court's second order, restoring the employee to his job without the imposition of any penalty, was improper, in part because the court was "punishing the innocent taxpayer and not the commissioners who defied the court's order." (*Id.* at p. 734.) This case is similar, as the trial court's order of a rent increase in an amount that may not be necessary to assure the owner a fair return in effect punishes the innocent mobilehome space tenants, who must pay the rent increase, rather than the Board which failed to comply with its order.

■ Finally, Carson Gardens insists that remand to the Board is not required because no other rent increase is possible based upon the administrative record. In effect, Carson Gardens claims the evidence supports only application of gross profits maintenance analysis, or application of MNOI analysis, without deviation. ■ While the Board cannot take new evidence on remand, nothing in the City's ordinance requires the Board to apply any particular formula or methodology without deviation. Indeed, the City's guidelines specifically state that the gross profits maintenance analysis "is an aid to assist the Board in applying the factors in the Ordinance and is to be considered together with the factors in [the ordinance], other relevant evidence presented and the purposes of the Ordinance," and is not intended to create any entitlement to any particular rent increase. Accordingly, we see no reason why the Board may not, on the present administrative record, assess the evidence, consider the results of gross profits maintenance analysis, and make findings as to the appropriate implementation of that analysis—all in consonance with its duty under the ordinance to grant an increase that both "protects Homeowners from excessive rent increases and allows a fair return on investment . . . ." (Carson Mun. Code, § 4704, subd. (g).) Should the Board again fail to comply with the trial court's order to apply an analysis that gives due consideration to Carson Gardens's debt service costs, the trial court retains the power to impose fines and other sanctions and to make any other orders necessary for complete enforcement of its writ, all as authorized by Code of Civil Procedure section 1097.

## DISPOSITION

The order is reversed and the cause is remanded to the trial court with instructions to vacate its order mandating a rent increase of $113.36 per space per month, and to issue a new order remanding the action to the Board for further consideration, on the present administrative record, in accordance with trial court's April 2003 peremptory writ ordering the consideration of debt service costs and in accordance with the views expressed in this opinion. The parties are to bear their own costs on appeal.

Cooper, P. J., and Rubin, J., concurred.